UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
OSEN LLC,                                          :
                                                   :         Case No. 19-cv-6867 (JPC)
                              Plaintiff,           :
                                                   :
            -against-                              :
                                                   :
UNITED STATES CENTRAL COMMAND,                     :
                                                   :
                              Defendant.           :
-------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT UNITED STATES CENTRAL COMMAND'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 3

    A.   The Attacks ........................................................................................................ 4

    B.   Agreements Between the Parties ....................................................................... 6

    C.   *Osen I* and *II* .................................................................................................. 8

    D.   Withholdings at Issue ...................................................................................... 17

ARGUMENT ................................................................................................................ 18

I.     Standard of Review ............................................................................................ 18

II.    The Withholdings .............................................................................................. 19

    1.   EOD/WIT and Intelligence Assessments and EFP Information ..................... 19

        A.   EOD/WIT Assessments ............................................................................ 20

        B.   S2 Assessments ......................................................................................... 21

    2.   Excessive Image Redactions ......................................................................... 23

        A.   Redactions to Photographs of Damaged Vehicles .................................... 23

        B.   Redactions to Photographs of Weapons Evidence .................................... 25

        C.   Redactions to Photographs of Attack Scenes ........................................... 26

    3.   Pages Withheld in Full .................................................................................. 27

    4.   Vehicle Model Numbers and Names ............................................................. 27

    5.   Originally Unclassified Records .................................................................... 28

    6.   Locations and CIDNE Tracking Numbers ..................................................... 31

    7.   Units and Call Signs ...................................................................................... 33

    8.   Damage to Vehicles ....................................................................................... 34

    CONCLUSION ...................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A. Michael's Piano, Inc. v. F.T.C.*,
    18 F.3d 138 (2d Cir. 1994) ................................................ 18

*ACLU v. DOD*,
    229 F. Supp. 3d 193 (S.D.N.Y. 2017) ................................ 18, 19

*Berman v. C.I.A.*,
    501 F.3d 1136 (9th Cir. 2007) .......................................... 29

*Campbell v. DOJ*,
    164 F.3d 20 (D.C. Cir. 1998) ........................................... 19

*Dep't of Air Force v. Rose*,
    425 U.S. 352 (1976) ...................................................... 18

*Detroit Free Press v. Ashcroft*,
    303 F.3d 681 (6th Cir. 2002) ........................................... 30

*DOJ v. Reporters Comm. For Freedom of Press*,
    489 U.S. 749 (1989) ...................................................... 18

*EPA v. Mink*,
    410 U.S. 73 (1973) ....................................................... 18

*Hall v. C.I.A.*,
    668 F. Supp. 2d 172 (D.D.C. 2009) ................................... 4

*King v. U.S. Dep't of Justice*,
    830 F.2d 210 (D.C. Cir. 1987) ......................................... 19

*Lapidus L. Firm, PLLC v. Washington Metro. Area Transit Auth.*,
    No. 20-cv-161 (JDB), 2021 WL 6845004 (D.D.C. Feb. 25, 2021) ......................... 12

*New Hampshire v. Maine*,
    532 U.S. 742, (2001) ..................................................... 24

*Osen LLC v. U.S. Central Command*,
    969 F.3d 102 (2d Cir. 2020) ......................................... 1, 10, 11

*Osen LLC v. United States Central Command*,
    375 F. Supp. 3d 409 (S.D.N.Y. 2019) ............................. 6, 8, 9, 10

*Wilner v. Nat'l Sec. Agency,*
  592 F.3d 60 (2d Cir. 2009) ................................................................. 18

*Wilson v. CIA,*
  586 F.3d 171 (2d Cir. 2009) ................................................................. 9

**Statutes**

5 U.S.C. § 102 ................................................................................. 15

5 U.S.C. § 105 ................................................................................. 15

5 U.S.C. § 552 ........................................................................... 1, 4, 8, 18

**Other Authorities**

David E. Pozen, *The Mosaic Theory, National Security, and the Freedom of Information Act,*
  358 Yale L. J. 628, 653 (2005) ............................................................. 30

Executive Order 13,526 .................................................................... 15, 16

**Regulations**

32 C.F.R. § 2001.1 ........................................................................... 15

32 C.F.R. § 2001.12(b) ...................................................................... 16

## INTRODUCTION

Defendant U.S. Central Command's ("CENTCOM") motion and papers almost entirely disregard the parties' conduct, agreements, and resolution of their Freedom of Information Act ("FOIA") suits over the last five years. Principally, CENTCOM's papers and positions ignore:

(1) the holdings from *Osen LLC v. U.S. Central Command*, No. 17-cv-4457-KPF ("*Osen I*") and *Osen II*, 969 F.3d 102 (2d Cir. 2020);

(2) its *own* positions in *Osen I/II* on what information did and did not require withholding; and

(3) written agreements made between the parties in narrowing the issues in dispute—not just during *Osen I* but in litigating *this case*.

CENTCOM's decision to burden the Court with this motion is thus nothing short of mystifying. The records sought in this case do not differ in type or age from those CENTCOM produced in *Osen I*; indeed, a quarter of the records it produced in this litigation it *also* produced in the prior litigation, but with far fewer redactions. Plaintiff's objections to redactions CENTCOM made in this case were premised *entirely* on the holdings in *Osen I/II*, CENTCOM's redaction policies as applied in those cases, and the parties' agreements, all of which CENTCOM now ignores.

And because CENTCOM ignores the parties' prior agreements, it has moved for summary judgment on issues that are not in dispute. These include its motion for summary judgment on:

(1) **Withholdings CENTCOM made on privacy grounds pursuant to FOIA exemptions 5 U.S.C. § 552(b)(3) and (b)(6) ("privacy redactions").** These issues were *already resolved by the parties*, and as a result of those discussions, Plaintiff's counsel explained that "[a]ll [of its objections to] redactions are to b(1) withholdings only, given our prior agreements regarding b(6) redactions." Declaration of Michael Radine ("Radine Decl."), Ex. A.[1]

(2) **Withholdings CENTCOM made pursuant the FOIA exemption 5 U.S.C. § 552(b)(1) ("b(1)" or "national security redactions").** CENTCOM is moving for summary judgment on withholdings it either lost on, agreed to remove, or

---

[1]   The parties' agreement as to b(6) redactions applies with equal force to CENTCOM's b(3) redactions, which here are all privacy-based redactions.

generally never made in *Osen I*.

(3) **Withholdings that Plaintiff does not object to.** For example, it justifies withholding "the distance between the affected vehicles and the EFPs, the distance from the EFPs to the ground, and the angle at which the EFPs are directed." CENTCOM Br. at 12. But Plaintiff had already explained to CENTCOM that "[i]n *Osen I*, we did not object to redactions of certain specific information such as the device's angle or the number of feet it was placed from the convoy which CENTCOM believed could be useful information for other attackers." Radine Decl., Ex. B.

Thus, CENTCOM's motion is not just wrong as a matter of law, it also constitutes an inexplicable waste of the months the parties spent narrowing the case. Its supporting documentation provides no help. The *Vaughn* index is hopelessly vague, as is the Declaration of Major General Patrick D. Frank ("Frank Decl."); justifications for whole categories (e.g., location of attacks) is not given at all, much less explained on a "specific" basis, as the law requires.

CENTCOM's willingness to justify any redaction, even where evidently accidental (and even where further review suggests it never even made the redaction it is now defending, as in the case of unit names), flies in the face not just of FOIA's "dominant objective" of "disclosure," but also growing concerns of overreach from U.S. government officials: The U.S. Director of National Intelligence Avril Haines recently wrote in a letter to Senators Ron Wyden and Jerry Moran that the government's excessive withholding of classified information "undermine[s] our national security, as well as critical democratic objectives, by impeding our ability to share information in a timely manner' with allies, policy makers and the public;" the Senators said in a joint statement that "Director Haines clearly recognizes that the current broken classification system harms U.S. national security while eroding the public's trust in government." Radine Decl., Ex. C.

CENTCOM's motion suggests that, rather than heeding FOIA's presumption of disclosure, it seeks to withhold ever more information, on ever older records, and with ever more spurious justifications. To grant CENTCOM summary judgment would be to ratify this conduct into law

and would eliminate judicial review over its FOIA compliance entirely.

## FACTUAL BACKGROUND

Plaintiff represents hundreds of U.S. service members who were killed or injured in Iranian-backed terrorist attacks (the "Attacks") while serving in Iraq, as well as their families (collectively, the "Victims"). The Victims retained Plaintiff to bring civil suits against Iran and its instrumentalities under the Foreign Sovereign Immunities Act for supporting and directing attacks against U.S. forces, as well as several international corporations for allegedly aiding and abetting these attacks and conspiring with Iran to finance terrorism, including the Attacks in this case.

To prosecute these cases, Plaintiff requests records from CENTCOM and other governmental agencies under FOIA on the Victims' behalf to (a) prove that Iran was responsible for the Attacks; and (b) document the Victims' injuries or the circumstances of their deaths, including any pain and suffering the deceased Victims may have experienced.

Specifically, Plaintiff files requests on an ongoing basis, as Victims retain it to represent them. On occasion, a Victim retains Plaintiff after the firm has made a FOIA request for another Victim in the same attack; in that case, Plaintiff makes another FOIA request for the second Victim to get any records that might relate solely to that victim (like injury-related records such as "casualty reports") and thus would not be produced in response to the prior request. Plaintiff made this clear in its complaint, attaching an exhibit listing the requests and noting for each "[w]hether CENTCOM produced records relating to the attack at issue in the Request in *[Osen] I* (indicated as "Yes"), but has still not produced victim-specific records, such as casualty reports." Complaint, ECF No. 1, at 6. Nevertheless, CENTCOM has produced the same attack records again for these overlapping attacks, showing significant differences discussed below.

However, FOIA requests made to CENTCOM (and other agencies) can languish for years, requiring suits like this one to shake the requested records free from the agency. The FOIA statute

permits requesters to bring suit demanding production if the agency fails to give a substantive response within 20 days of receiving the request, *see* 5 U.S.C. § 552(c)(i); however, to avoid a multiplicity of suits taking up judicial resources, Plaintiff only brings suit periodically as more unanswered requests accumulate. Plaintiff's first such suit was *Osen I*; nothing else distinguishes this case from *Osen I* except the accumulation of additional unanswered requests since Plaintiff filed that suit—the attacks occurred in the same time period and under the same circumstances; again, about a quarter of the FOIA requests at issue in this case are ***Victim-specific requests*** relating to attacks already produced in *Osen I*. The ***only*** difference between these suits, therefore, is that in the intervening years since Plaintiff filed *Osen I*, the underlying facts at issue have grown yet older and less sensitive as a matter of national security, and the U.S. forces have almost entirely departed Iraq and now Afghanistan.

  *Osen I* and *II* of course govern this case, both under the res judicata/collateral estoppel doctrine and Circuit precedent. *See, e.g.*, *Hall v. C.I.A.*, 668 F. Supp. 2d 172, 179 (D.D.C. 2009) (holding that prior decisions between an agency and a FOIA requester creates collateral estoppel, and "collateral estoppel also applies against the CIA"). Therefore, Plaintiff made the objections it did in this case with the understanding that CENTCOM would continue to respect the agreements, concessions, and statements it made in *Osen I*.

## A. The Attacks

  To prove Iran and its Islamic Revolutionary Guard Corps ("IRGC") were responsible for each of the Attacks, Plaintiff highlighted two factors: (1) the use of an Iranian signature weapon, principally an Explosively Formed Penetrator ("EFP") or, less often, an Improvised Rocket-Assisted Munition ("IRAM"), and (2) the involvement of Shi'a terrorist proxy groups, called the "Special Groups" by the U.S. military (often referred to as "SGs," "SGCs," or "FSGs" in the records), which were created, trained, armed and directed by Iran and its Lebanese terror proxy,

Hezbollah. All of this information is available in records maintained by CENTCOM.

An EFP is an anti-armor roadside bomb, which, when precisely designed and manufactured from high quality components, could cut through the armor equipped on allied ("Coalition Forces") vehicles. *See* Declaration of Russell L. McIntyre, filed in *Osen I*, ECF No. 40, and resubmitted here for background purposes as Radine Decl., Ex. D, ¶¶ 16-17, 30. An EFP is made from a short steel or PVC pipe, generally 6-9 inches in diameter, sealed on the back end, packed with high explosives, and capped with a concave, metal (steel or copper) "liner." *Id.*, ¶¶ 28, 30. When detonated, the force of the explosion deforms the liner into a slug, travelling at a mile a second. *Id.*

The high-end EFPs designed and manufactured by Iran were packed with military grade explosives and usually capped with a liner made of precisely milled, industrially pressed and annealed copper, weighing several pounds. These EFPs, requiring materials and processes far outside the capability of local Iraqi terrorists, were all but unstoppable by conventional armor. As General (Ret.) Stanley McChrystal explained:

> [The copper slug], often the size of a bowling pin and traveling at twice the speed of a bullet, punctured inches of metal plating like water through snow. Inside the vehicle, the molten slug cut through legs and torsos, and its heat often lit the cab and the men inside on fire. Our heaviest armored vehicles were vulnerable and despite extensive countermeasures, in large number they were a potential game changer.

Radine Decl., Ex. E. A U.S. Army brigadier general explained that the EFP problem "was beyond the capability of anything in our arsenal . . . . And, by the way, you can't armor your way out of this problem." Radine Decl., Ex. F. Additional information, both on EFPs and the U.S. armored vehicles they target, is available in the McIntyre Declaration, Radine Decl., Ex. D.

An IRAM, sometimes called a "lob bomb," is a mortar-like IED designed to be launched (usually from a truck) over the walls of a military installation. An IRAM is typically a "large

canister, perhaps a propane or fuel tank, filled with explosives and propelled by 107mm rocket booster." Radine Decl., Ex. G. The "US military said these charges are 'of Iranian-manufacture,'" which Iran produced during the relevant period for its Special Group proxies to use in attacking U.S. and coalition forces. *Id.*

### B.    Agreements Between the Parties

In this case and in *Osen I*, the parties came to various agreements to disclose certain types of information, all of which CENTCOM now ignores. In *Osen I*, CENTCOM agreed to remove privacy redactions to information identifying the Victims and notorious or deceases terrorists, as well as terrorist groups. *See* Radine Decl. Ex. H. It also agreed to remove b(1) redactions to references to EFPs having copper liners. *See* Radine Decl. Ex. I. As a result, the district court noted that, prior to its judgement on the remaining issues:

> Defendant produced all information that it had disclosed in response to previous FOIA requests, all information regarding the use of copper in EFPs, and remaining references to "names of terrorist groups, public figures, the four 'heads of terrorist groups' specifically identified by Plaintiff, ... and "already exposed names[.]"

*Osen I*, 375 F. Supp. 3d 409, 417 (S.D.N.Y. 2019) (quoting CENTCOM's Reply Brief at 4-5). These agreements were important to the Victims' civil claims. The use of a copper liner in an EFP is an almost definitive indicator the weapon is a high quality, Iranian-manufactured weapon. Victims' personally identifiable information ("PII") helps prove they were injured or killed in a given attack, and identification of prominent terrorists and terrorist groups help Plaintiff associate a particular attack with an Iranian-sponsored terrorist proxy group.

Moreover, after Plaintiff complained in *Osen I* that "while CENTCOM has generally applied redaction boxes roughly the size of the information in question (generally, strike points), it has on other occasions redacted entire pages or images," "violat[ing] the segregability principle," Pls. *Osen I* Opp., ECF No. 38, at 11, CENTCOM stated that it "will reconsider its withholdings

on any specific pages identified by Plaintiff where Plaintiff claims that the redaction boxes are unnecessarily large." CENTCOM *Osen I* Opp., ECF No. 42, at 5-6.

In this case, the parties again agreed that CENTCOM would lift privacy-related redactions (i.e., redactions under b(3) and b(6)) to the PII of the Victims and notorious or dead terrorists. *See* Radine Decl., Ex. H ("the agency will go back through its withholdings to make sure that your clients' PII is not redacted," and "I think we can agree to reconsider any redactions for the names/PII of well-known or notorious terrorists, and potentially deceased alleged perpetrators."). Given that agreement, Plaintiff withdrew any challenges to privacy-based redactions in nominating the categories and samples of challenged redactions in this case. *See* Radine Decl., Ex. A ("All redactions are to b(1) withholdings only, given our prior agreements regarding b(6) redactions.").

CENTCOM also regularly disclosed other types of information in *Osen I*, including (1) assessments of the weapon and terrorist group likely responsible for each attack, (2) types of U.S. vehicles involved, (3) attack locations/scenes, (4) units and call signs, and (5) information originally marked unclassified, such that no agreement was necessary. Thus, Plaintiff, relying on CENTCOM's evident position that these types of information did not require withholding, did not challenge them in *Osen I* and the court did not order them withheld.

But notwithstanding these agreements in *Osen I* and here, CENTCOM has now reverted to redacting these types of information. Despite Plaintiff's withdrawal of its challenges to privacy withholdings, CENTCOM now seeks unqualified summary judgment on privacy redactions anyway. Its justifications for withholding the PII of service members and alleged terrorists from the records does not exempt the Victims or notorious or dead terrorists (or "names of terrorist

groups," *Osen I*, 375 F. Supp. 3d at 417) or acknowledge the parties' agreement at all.[2] Even if, as Plaintiff hopes, CENTCOM intends to honor that agreement notwithstanding its motion for summary judgment, granting it summary judgment on any b(3) and b(6) redactions would create an advisory opinion since those redactions are not at issue or challenged in this case.

CENTCOM has also started redacting the term "copper" again, albeit inconsistently (the word "copper" is disclosed at least 80 times in the *Osen III* production).[3] Accidents happen—but far more concerning is that even after Plaintiff pointed out to CENTCOM that it had redacted "copper" (and EFP diameter) despite its prior agreements (and non-appealed court rulings), *see* Radine Decl., Ex. K, CENTCOM has not removed the redactions and continues to attempt to justify them, *see* Frank Decl., ¶ 27 (explaining redaction of "materials used to manufacture" EFPs).

Finally, as discussed at length below, CENTCOM has begun redacted whole images at a much higher rate than in *Osen I*, violating the segregability principle as even CENTCOM understood it. Plaintiff pointed this out too, but CENTCOM did not budge.

C.     *Osen I* and *II*

Given the parties' agreements and CENTCOM's practice of not redacting certain kinds of information, the district court's review of Plaintiff's b(1) redaction objections in *Osen I* was limited to CENTCOM's withholding of (a) the <u>limited</u> portions of photographs of vehicle damages showing the actual EFP penetrations to armor, called "strike points," and (b) textual information on the diameter of EFPs used in attacks. The district court ruled for Plaintiff on both issues.

---

[2]        On a handful of occasions, CENTCOM in this case redacted the name of an alleged terrorist under b(1), although it is hard to imagine how disclosing the name of a terrorist presents a national security threat to the U.S. For example, it redacted certain names under b(6) in *Osen I* in I:1:46-47, but redacted the **same** names under b(1) on III:1:491-92, without explanation. Radine Decl., Ex. J.

[3]        Radine Decl. ¶ 16. Plaintiff knows the contents of some redactions from (1) productions of the same records CENTCOM made in *Osen I* and (2) unredacted versions published on the WikiLeaks website. Of course, the Court can review any of the records at issue *in camera* to confirm Plaintiff's understanding of the redacted information.

On the images, in *Osen I* Plaintiff argued that the Department of Defense ("DoD"), of which CENTCOM is a subcomponent, had evinced a willingness to disclose the strike point portion of images, given a handful of examples Plaintiff provided: (1) a set of images from a single attack that CENTCOM produced to another FOIA requester; (2) a set of images from a single attack that ARCENT, another DoD subcomponent, had produced to Plaintiff; and (3) various one-off disclosures DoD had made to media outlets or in other DoD publications.

CENTCOM argued in response that limited disclosures from a handful of attacks—which disclosures may have been mistaken or carefully divorced of contextual information—did not justify releasing all similar information from the records from the 100+ attacks Plaintiff requested, each of which could present slightly different circumstances. Unlike the limited disclosures Plaintiff had identified, disclosing such information *en masse* could purportedly give the U.S.'s enemies a compendium of useful information in exploiting American military vulnerabilities.

On EFP diameter, CENTCOM argued in *Osen I* the disclosures, although much more rampant, were all the results of human error, and argued that disclosing EFP size could inform the enemy of what sizes of EFP were most effective against American armor.

On the images of strike points, the district court in *Osen I* found that ARCENT's disclosure alone constituted waiver by official disclosure and showed a DoD policy in favor of disclosing such information under *Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009). *See Osen I*, 375 F. Supp. 3d at 422-23 ("Evidently, ARCENT has made a determination that this type of material does not pose a risk to national security."). On EFP size, the district court held that "a large number of disclosures [that] contain [similar] information" constituted waiver "by official disclosure," and rejected CENTCOM's attempt to dismiss them as isolated errors. *Osen I*, 375 F. Supp. 3d at 419-20. It also found that CENTCOM's explanation for withholding EFP size did not explain why it had done so

only a minority of the time. *Id.* Specifically, the district court explained:

> On the subject of EFP size, the Court agrees with Plaintiff that the material already disclosed constitutes a waiver of Exemption 1 by official disclosure. Nowhere in its briefing does CENTCOM dispute that a large number of disclosures contain information on EFP size. CENTCOM did not provide objections to disclosure on EFP size in its initial motion, only stating its objections in opposition and in the supplemental declaration of General Ferrell attached to Defendant's opposition. CENTCOM states that this was merely the result of oversight and offers no independent reason for classification of the EFP sizes. However, the declaration does not address the material on EFP size that was disclosed in the prior releases. Osen identifies 11 pages where EFP size is redacted against over 40 where it is disclosed. **In the absence of further explanation for why these redactions are substantively different than the material already disclosed, the Court determines that CENTCOM has officially disclosed the material on EFP size.**
>
> The EFP size revealed in the majority of pages through official FOIA disclosures is "as specific" as the prior disclosures. *Wilson*, 586 F.3d at 186. CENTCOM does not attempt to explain why the information that has been withheld poses risks that the disclosed material did not, nor does it offer an explanation for why prior disclosures in this area were mistakes. The Court holds that Plaintiffs are entitled to the remaining material on EFP size. The Court now turns to the redacted photographs of EFP strikes.

*Osen I*, 375 F. Supp. 3d at 419-20 (emphasis added, some record citations and parentheticals omitted).

CENTCOM chose not to appeal this issue, as the Circuit Court noted: "The district court found that CENTCOM waived Exemption 1 under the official disclosure doctrine with respect to the withheld EFP size information…. CENTCOM does not challenge the district court's order as to EFP size information on appeal…." *Osen II*, 969 F.3d at 108 n.1. *See also* Radine Decl., Ex. K at 1 (CENTCOM stating the same). As a result, that holding, and the analysis supporting it, remains in place as between the parties.

Moreover, the Circuit did not dispute the district court's analysis. The Circuit accepted CENTCOM's reasoning that because each attack could raise different factual circumstances, *isolated* disclosures of certain information from a "single attack," such as the ARCENT disclosure, or a small handful of attacks does not constitute a complete waiver of withholding that type of

10

information from *all* attacks. Under the substantial deference standard, the Circuit accepted CENTCOM's argument that limited, one-off disclosures may be of limited value to our enemies, but if it were forced to disclose such information *en masse*, our enemies might be able to piece together a broader picture of our military's vulnerabilities.

However, the Circuit explained that where CENTCOM *has already* produced a certain type of information *en masse*, there is little justification in withholding the remaining occasions, at least where the agency could not explain why the withholdings were more sensitive:

> ARCENT's FOIA Production does not contradict [CENTCOM declarant] General Ferrell's declaration that a large disclosure of all such images will pose a unique risk to national security that **smaller, isolated productions** of the same type of images do not. ARCENT disclosed a small number of images that pertain to a single attack; it did not produce images of EFP damage *en masse*. What matters as it relates to waiver is the lack of any identifiable distinction between ARCENT's FOIA Production and the other disclosed images.
>
> …. General Ferrell's declaration that a larger production of these types of images would endanger U.S. armed forces is not inconsistent with the existence of those prior disclosures, as Osen merely points to a **handful of disclosures** of images showing EFP damage from different attacks during the relevant time period. The more images of different attacks that become available to the public, the more adversaries might learn about the Army's weaponry, a potential development that CENTCOM logically posits puts national security at risk. **Of course, the more images of individual attacks that components of DoD voluntarily release on a piecemeal basis, the less compelling this position will become**; but as it stands, CENTCOM's reasoning is sound, and entitled to substantial weight in its favor.

*Osen II*, 969 F.3d at 113, 116 (emphasis added).

This is a common-sense rule, as well. Failing to redact the occasional instance of a piece information may signify an excusable mistake; but redacting a type of information half the time— without explanation as to what distinguishes one half from the other—is not a mistake; it is waiver. To hold otherwise is to permit the government to make redactions arbitrarily, such that whether a piece of information is redacted is due not to its potential for causing serious damage to the national security of the United States, but which FOIA officer happened to be assigned to a given request.

11

*See, e.g.*, *Lapidus L. Firm, PLLC v. Washington Metro. Area Transit Auth.*, No. 20-cv-161 (JDB), 2021 WL 6845004, at \*5 (D.D.C. Feb. 25, 2021) ("the selective redaction of its driver's address and the other driver's phone number appears arbitrary"). Indeed, even within the seven productions in this case, the redaction policies appear to differ. For example, CENTCOM produced records for the same attack in the first and third productions with very different redactions. *See infra* at 16.

Here, CENTCOM has again redacted information in some categories less than half the time—sometimes far less. It does not explain why information it regularly produced in *Osen I*—or, again, even in *this case*—must be redacted here, and then often just occasionally. And because some of the *same* attack records produced here were also produced in *Osen I* with fewer redactions, Plaintiff and the Court can see that the redactions in *Osen III* are excessive and contrary to its prior positions.

For example, CENTCOM has withheld a handful of record tracking numbers assigned to documents stored in CENTCOM's Combined Information Data Network Exchange database ("CIDNE"). In our review of the records, we located approximately 745 pages with one or more references to CIDNE tracking numbers across all of CENTCOM's productions to Plaintiff (including 290 in the records produced in this litigation). Of these 745 instances, CENTCOM has redacted numbers on *13* pages, for a rate of less than 2%, all of which were in this case. CENTCOM does not suggest the few instances it redacted somehow differ from the hundreds it did not. The redactions were likely mistakes; but CENTCOM appears willing to rationalize and justify any withholding, no matter how incoherent. *See Vaughn* Index at 7 ("CIDNE tracking numbers").

But even in the one category where CENTCOM has most consistently redacted information in *this* case—vehicle types—the redactions are wildly at variance with the thousands of pages it produced in *Osen I* disclosing vehicle types. Those prior disclosures constitute a waiver as to

vehicle type because nothing differentiates the records in *Osen I* from those here; disclosures are disclosures. Again, although CENTCOM gives a vague explanation for why it is withholding vehicle types now, it does not bother to explain how these instances differ from the hundreds of instances it disclosed before (or the numerous occasions it discloses them in this case).

Comparing productions made in this case to copies of the same records it produced in *Osen I* makes this even clearer. For example, Plaintiff nominated III:6:82-83[4] as a sample in a number of categories. In the version of that record produced in this case, CENTCOM applied heavy redactions, including to extensive EOD/WIT assessment analysis, weapons component information, vehicle types, and call signs. But CENTCOM previously produced the *exact same* record at I:1:1428-31 with *all* of this information disclosed. *See* Radine Decl., Ex. L.

Similarly, III:2:939 bears heavy redactions to the post-blast analysis ("PBA"), compared to the minimal redactions CENTCOM applied when producing the very same record in *Osen I* at I:1:1771-73. Radine Decl., Ex. M. These redactions include vehicle type (Maxxpro MRAP), location of the penetration ("Two slugs penetrated the hull") and EFP composition ("This was a substantial point of impact by copper which did not breach the armor of the vehicle"). *Id.* Finally, as shown below, unlike in *Osen I,* here CENTCOM has withheld *whole* pages, which is the most problematic type of withholding, because Plaintiff is left with little context to assess it. *See* Radine Decl., Ex. N, discussed below at 27.

Another prime example is sample III:1:484, attached here as Radine Decl., Ex. O.[5] Plaintiff nominated that page as a sample of an inappropriately redacted a "WIT assessment," although it

---

[4]     All records are notated by [*Osen* case number, I or III]:[production number, or "R" for a document CENTCOM reproduced with fewer redactions after *Osen I*]:[Bates number].

[5]     Because CENTCOM also made significant redactions to the previous page (III:1:483) which it did not in *Osen I* (I:1:38), Plaintiffs have included those pages as well.

has redactions falling into several categories. CENTCOM redacted:

- the initiation system ("It is likely the initiation system was small and compact, and possibly placed directly in front of the EFP…."), EFP diameter ("10 inches"), the amount of explosives ("between 7 and 10 lbs") from the WIT assessment, and evidence of the liner ("copper slug fragments" and "copper frag");

- portions of three CIDNE tracking numbers (but missing a fourth); and

- the name of the responsible party ("Ahmad Qasim Al Bahadli's EFP cell").

CENTCOM had produced the same exact page in *Osen I* as I:1:38-39, *id.*, with none of these redactions in place except as to the EFP diameter and amount of explosives; but following the resolution of *Osen I*, CENTCOM *re-produced* the page (I:R:39), removing those redactions as well. Radine Decl., Ex. P. Thus, CENTCOM is now not only making redactions it never made before, but is also *reversing removals* of redactions it made due to the holdings in *Osen I*.

In another example, CENTCOM reversed its removal of redactions in an "EOD Team Leader Analysis and Assessment." In *Osen I*, it produced this version at I:1:25:

> Analysis led Team Leader to believe that the vehicle was struck by single EFP [ (b)(1)1.4g ] ue to the damage of the vehicle. No initi ion system could be determined on site. Team leader believes initiation system to be a PIR placed in front of the EFP due to the lack of components found and the direct hit on the engine.

After agreeing to release more EFP information, CENTCOM re-released the same record with no redactions, showing its diameter and 25 lbs "NEW," or net explosive weight, of charge:

> Analysis led Team Leader to believe that the vehicle was struck by single EFP (Approximately 8 inch diameter 25lbs NEW) due to the damage of the vehicle. No initiation system could be determined on site. Team leader believes initiation system to be a PIR placed in front of the EFP due to the lack of components found and the direct hit on the engine.

I:R:25. In this case, however, CENTCOM has moved backwards—now the EFP diameter and explosives are again redacted, but so is the location of the strike on the vehicle (III:1:555):

> Analysis led Team Leader to believe that the vehicle was struck by single EFP [ (b)(1)1.4g ] [ (b)(1)1.4g ] due to the damage of the vehicle. No initiation system could be determined on site. Team leader believes initiation system to be a PIR placed in front of the EFP due to the lack of components found [ (b)(1)1.4g ]

Again, one thing has changed since *Osen I* was decided three years ago—the information at issue has become even less operationally relevant. These records are now significantly older than they were in *Osen I*. U.S. forces departed Iraq 11 years ago, and now only minimal, non-combat advisory forces remain. The routes, locations, troop movements, and countless other facts in these records are now part of history (the U.S. Army published its official—and highly detailed—two-volume history of the Iraq war, *The U.S. Army in the Iraq War* (U.S. Army War College, 2019) three years ago). And since *Osen I*, U.S. forces have also departed Afghanistan, our other major conflict in the region, making additional information further obsolete.

Indeed, in *Osen I*, CENTCOM's counsel explained that it did not redact *photographs of EFP damage* to an M1114 HMMWV—much less withholding its model number—because the vehicle had become obsolete:

> I've recently learned of one example where Cent. Comm. did release information in response to a different FOIA request. My understanding currently is that the vehicle that was depicted in that image is an older type of vehicle that's not currently in use in the theater anymore. So that may have had a role in terms of what was and wasn't withheld.

Pre-Motion Conference Transcript, *Osen I* (Nov. 9, 2017) at 9:15-21, ECF No. 23. As Mr. McIntyre explained, the other models of HMMWV are also being phased out of use. Radine Decl. Ex. D, ¶ 39 & n.22.

Indeed, unlike at least some of the records in *Osen I*, all the records at issue here are over ten years old, which is sufficiently old that they were all *automatically declassified*. Under Executive Order 13,526 § 1.5, "information shall be marked for declassification 10 years from the date of the original decision" classifying the information.[6] If the date is not extended by the time

---

[6]     These provisions implement E.O. 13,526, and are "binding on agencies," including "any 'Executive agency'" as defined in 5 U.S.C. § 105; any "Military department" as defined in 5 U.S.C. § 102; and any other entity within the executive branch that comes into the possession of classified information." 32 C.F.R. § 2001.1.

the 10 years has passed, "the information is *automatically declassified* upon the occurrence of the date or event." 32 C.F.R. § 2001.12(b) & (b)(2). And while CENTCOM can reclassify information under certain circumstances, E.O. 13,526 § 1.7, it is clear that the FOIA's presumption of disclosure is at its strongest for such aging records.

Even *within* the records produced in this case, CENTCOM is wildly inconsistent. As stated above, for most of the objection categories, CENTCOM has redacted information only a minority of the time. When it has, on occasion, produced the same records twice in this case, it has done so with very different results. For example, III:1:443-68[7] and III:3:47-67 (Radine Decl. Exs. Q and R) are two *identical* sets of records from this case—but with very different redactions:

- Revealed is a bizarre b(6) privacy redaction to the CIDNE website domain on III:3:47 but not from III:1:446 ("https://cidneconus.centcom.smil.mil/"). That is not an individual's personally identifiable information.

- CENTCOM redacted a wall of text containing an S2 assessment and an EOD assessment on III:1:448, but only redacted a *single word* of it on III:1:49. III:1:451 redacts some vehicle types that III:3:66 does not (Husky/Meerkat).

- CENTCOM redacted an entire S2 assessment in III:1:453 but not in III:3:52.

- CENTCOM redated out the model of the affected vehicle in an originally unclassified image in at III:1:465, but did not on III:3:64 ("RG-33").

- CENTCOM entirely redacted every single photograph in one version, but produced several without *any* redactions in the other: III:1:464 (a night vision view of a blast seat), 460 (night vision view of the scene), 459 (night vision view of the approach the vehicle took, with precise coordinates).

CENTCOM also produced these attack records in *Osen I* at I:1:1597-1621 (Radine Decl., Ex. S). Unsurprisingly, these records bear almost none of the redactions in either of the *Osen III* versions. For example, *all* of the images were disclosed with minimal redactions.

---

[7] This version includes an intelligence document, III:1:467-68, that the other version did not for some reason.

### D.     Withholdings at Issue

As CENTCOM explained, because of the volume of materials at issue, the agency asked Plaintiff to agree to a system of sampling representative withholdings for review by the Court, which determinations the parties agreed would apply to similar withholdings in CENTCOM's productions. As explained above, Plaintiff only objected to b(1) withholdings and only those that are inappropriate given the parties' agreements and *Osen I* and *II*. The following are the categories agreed upon by the parties (although CENTCOM objects to some phrasing):

1. Redactions to "assessments" of attacks made by Explosive Ordnance Disposal units ("EOD"), Weapons Intelligence Teams ("WITs"), or S2 (intelligence) components, or except as necessary or as previously agreed-upon by the parties.

2. Excessively redacted images, specifically redactions to (a) more than the EFP "strike points" on a photograph of a damaged vehicle, (b) images of collected evidence of detonated or captured weapons, and (c) images of attack "scenes" or environments.

3. Pages withheld in full (rather than produced but redacted).

4. Vehicle types, as in model numbers or names.

5. Redactions to information about EFPs, including their material composition, diameter, components, and number in an array.

6. Records originally marked "unclassified."

7. Miscellaneous redactions, such as text descriptions of vehicular damage and geographic locations of attacks.

8. "CIDNE" document tracking numbers.

9. Victim and responding unit names and call signs.[8]

Plaintiff proposed samples for each category of information redacted or withheld (which we attempt to highlight below by referring to certain cites as "samples"). In doing so, Plaintiff noted that "some of the categories overlap to some extent, and some pages or redactions will fit

---

[8]      These categories are addressed in slightly reorganized fashion below.

into multiple categories—in a few cases, [we] included a page more than once to highlight that, but that is not meant to suggest that other samples would not fit into multiple categories." Radine Decl. Ex. A (note some sample cites subsequently changed). CENTCOM has moved for summary judgment as to each of these categories, except for "call signs" in category 9 (but not unit names).

## ARGUMENT

### I.  Standard of Review

FOIA's "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act. 'These exemptions are explicitly made exclusive' . . . and must be narrowly construed." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973)). This Court reviews CENTCOM's decision to withhold records under a FOIA exemption *de novo*. 5 U.S.C. § 552(a)(4)(B). *See ACLU v. DOD*, 229 F. Supp. 3d 193, 207-08 (S.D.N.Y. 2017) ("[u]nlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'") (quoting *DOJ v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 755 (1989)). "*De novo* review was deemed essential to prevent courts reviewing agency action from issuing a meaningless judicial imprimatur on agency discretion." *A. Michael's Piano, Inc. v. F.T.C.*, 18 F.3d 138, 141 (2d Cir. 1994) (noting Congress's "general, firm philosophy of full agency disclosure").

CENTCOM must "describe the justifications for nondisclosure with reasonably *specific* detail, demonstrate that the information withheld *logically* falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *ACLU*, 229 F. Supp. 3d at 207 (quoting *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009)) (emphasis added). CENTCOM "must provide an accounting of *how* it reached its conclusion, so that the court has 'an adequate foundation to review' whether the Government has

satisfied its burden." *Id.* (quoting *Campbell v. DOJ*, 164 F.3d 20, 30 (D.C. Cir. 1998)).

Explaining how it reached its conclusions is also necessary "to afford the FOIA requester a meaningful opportunity to contest" them. *Campbell*, 164 F.3d at 30 (quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 218 (D.C. Cir. 1987)). "Specificity is the defining requirement of the *Vaughn* index and affidavit" and cannot be "conclusory[,] ... too vague or sweeping. To accept an inadequately supported exemption claim would constitute an abandonment of the trial court's obligation under the FOIA to conduct a *de novo* review." *King*, 830 F.2d at 219. Thus, while CENTCOM's national security determinations are afforded "substantial weight," "deference is not equivalent to acquiescence ...." *Campbell*, 164 F.3d at 30.

## II.    The Withholdings

### 1.    EOD/WIT and Intelligence Assessments and EFP Information

Most sets of attack records contain "assessments" made by EOD units, WITs, and other teams (together, "EOD/WIT assessments") and intelligence teams (S2, C2, G2, etc., depending on the staff level; together, "S2 assessments"), which provide conclusions as to what weapon was involved and who was likely responsible for it.

These assessments provide evidence indicating whether a given roadside attack involved an Iranian-manufactured EFP (or in a few cases, an IRAM or other Iranian-supplied weapon) and/or an Iranian proxy group. They often include some key information on the weapon components (liner type, amount and type of explosives, initiator and triggering mechanisms), array (how many EFPs were combined into the complete weapon), and EFP diameter, and that it was likely emplaced by an Iranian-sponsored terror cell.

In *Osen I*, CENTCOM rarely substantially redacted these assessments or the types of information found in them; in fact, even in this case, CENTCOM has often not excessively redacted them (in *Osen I*—and here—Plaintiff has not objected to CENTCOM redacting

information relating to convoy spacing and speed, EFP angle and distance to target, and the vehicles' counter-IED devices). By Plaintiff's count, CENTCOM has entirely or mostly disclosed EOD/WIT assessments on nearly **250** pages and S2 assessments on over **200** pages in *Osen I* and this case, and substantially redacted them on fewer than 40 pages, for a rate of less than 10%, easily constituting waiver. *See* Radine Decl. ¶ 13.

In fact, in an attempt to narrow the issues in dispute in this case, Plaintiff provided CENTCOM with a 20-page exhibit showing excerpts of dozens of assessments that CENTCOM had produced with minimal redactions in *Osen I*, provided here as Radine Decl., Ex. T, but that did not alter its position. Nor has CENTCOM's policy clearly shifted—Plaintiff also showed that CENTCOM produced a two-page long, almost entirely unredacted EOD assessment on September 9, 2021, well into this litigation. *See* Radine Decl., Ex. U. But even these relatively infrequent redactions pose a serious problem because these assessments obviously constitute core information the Victims need to pursue their legal claims, which depend on linking Iran and its IRGC to specific attacks through the use of signature Iranian weapons and Iranian-sponsored cells.

### A.   EOD/WIT Assessments

In an attempt to narrow the issues in dispute, Plaintiff pointed out to CENTCOM that it had redacted the following from an "EOD ASSESMENT":

> EOD[ ]TEAM IDENTIFIED TWO STRIKE POINTS ON TC WINDSHIELD CONSISTENT WITH A DUAL ARRAY 8\"COPPER LINE[D] EFP. NO INITIATION SYSTEM OR COMPONENTS FOUND ON SITE.

Radine Decl. Ex. K (May 18, 2021, e-mail from Plaintiff to Defendant relating to III:6:281). Again, all of these precise types of information have been regularly produced and/or ordered produced by the *Osen I* court:

- **The location of strike points:** Here, the EFP hit the "TC windshield," meaning it hit the "Truck Commander," or passenger, side of the windshield. Nearly every attack lists the strike point location, either in text

or photograph captions. *See, e.g.*, Radine Decl. Ex. EE.

- **The number of EFPs in an array:** Here, two (i.e., "dual"). CENTCOM nearly never redacted this information (we located **500** pages with array disclosures, Radine Decl. ¶ 15)—in fact, in one instance where it redacted it in *Osen I*, it **reproduced** the page without the redaction, exhibiting CENTCOM's policy to produce such information. Radine Decl., Ex. V.

- **The diameter:** Here, eight inches (expressed as 8\"). As explained above, the district court ordered CENTCOM to disclose EFP diameter, and CENTCOM did not challenge that decision on appeal.

- **Composition of the EFP:** Here, the copper liner (i.e., "copper-line[d]"). As noted above, CENTCOM agreed to produce this information, as the district court recognized in *Osen I*.

- **Initiation/triggering systems:** Redacted here even though none was found; but the initiator and triggering mechanisms are not typically redacted. Plaintiff located nearly **400** pages on which the initiator[9] was disclosed (from both cases), including where it could *not* be found. *See* Radine Decl. ¶ 14. *See also* Radine Decl., Ex. W (showing a *Osen III* record redacting "PIR detonator" which is disclosed in the *Osen I* version).[10]

As for the nominated samples, the situation is similar. The samples include III:1:484, which is described above at 13-14. Radine Decl., Ex. O. It also includes redactions Plaintiff cannot see but for WikiLeaks versions. For example, III:7:38 redacts out the phrase "3 array copper EFP …. Crat[er] 6ft x 6ft x 2 ft. Unknown initiator or device." Radine Decl., Ex. Y. For these, CENTCOM must—but presumably cannot—explain why these particular EOD/WIT assessments are specifically more of a threat to U.S. national security than the dozens it disclosed.

B.   **S2 Assessments**

S2 assessments analyze who was likely responsible for an attack, such as Iranian-sponsored

---

[9]      Examples of initiation systems and triggers include command wires, passive infrared devices ("PIRs"), cell phones, and other forms of remote control ("RC").

[10]     In an example given above at 14, CENTCOM redacted out the explosives. It generally did not do so and did not justify doing so in its motion; that said, Plaintiff notes that in *Osen I*, CENTCOM even produced detailed mass spectrometry printouts of samples taken from EFPs, showing that they contained explosives like RDX, C-4, TNT, and others. *See* Radine Decl., Ex. X.

terror cells the U.S. military called "Special Groups" (often called "SGs," "SGCs," or "FSGs" in the records). The evidence they detail—Iranian weaponry and Hezbollah tactics, techniques, and procedures ("TTPs"), history of attacks in the area, and intelligence on specific cells—is obviously crucial to Plaintiff's efforts to show Iran is responsible for each attack at issue.

For example, these are two extracts from the **same record**; the extract on the left is from *Osen I* (I:1:760) and the extract from this case is on the right (III:1:426) (note the vehicle type, an M2A2 Bradley, is also redacted out of the header in the *Osen III* version on the right):



The agreed-upon samples of Plaintiffs' objections to S2 redactions are similar. Sample III:1:422 is from the same attack as the example above, but it redacts out a different S2 assessment—which was produced entirely in I:1:775. Radine Decl., Ex. Z. In sample III:7:55, CENTCOM redacted the S2 assessment in its entirety but it disclosed it entirely in *Osen I*, I:1:433 and 437. Radine Decl., Ex. AA. Likewise, in sample III:7:149, CENTCOM redacted all but four words of the S2 assessment, disclosing it entirely in I:1:8. Radine Decl., Ex. BB. Finally, sample III:1:484 is discussed above at 13-14. Radine Decl., Ex. O.

Even small redactions can be significant. In III:1:492, CENTCOM largely disclosed an S2 assessment, but for some reason redacted out the phrase "line of sight being required both for receiving payment from Iran"—i.e., the suspect must have been positioned such that he could film

the attack—but this same language was disclosed in the same document in *Osen I*. Radine Decl.,
Ex. CC. The needless redaction to the phrase is significant for the Victims' claims.

It also includes redactions Plaintiff cannot see but for WikiLeaks. For example, sample
III:7:108-09 redacts out the stock public affairs messaging provided following the attack for some
reason (which is routinely produced by CENTCOM). Radine Decl., Ex. DD.

### 2.    Excessive Image Redactions

In *Osen I*, CENTCOM made relatively limited redactions to photographs, diagrams, and
maps, entirely or partially disclosing well over a thousand. *See* Radine Decl. ¶ 17. Here,
CENTCOM has significantly increased the number of full redactions (or withheld pages entirely,
discussed below), including to many images also disclosed, with far more limited redactions, in
*Osen I*. As objected to here, these redactions fall into three categories: photographs of (1) vehicular
damage, (2) recovered weapons evidence, and (3) attack scenes, meaning the general area the
attack took place in (redactions to maps are discussed in the Locations category, below).

### A.    Redactions to Photographs of Damaged Vehicles

In *Osen I*, CENTCOM generally applied limited redactions to photographs of victim
vehicles, either leaving the image unredacted or applying redaction boxes roughly the size of the
strike points in question. In *Osen I*, CENTCOM produced over **160** completely unredacted images
of vehicles and over **320** partially redacted images of vehicles. *See* Radine Decl., Ex. EE (providing
**300** examples, taken from both categories).

Where CENTCOM on occasion did redact entire vehicle images in *Osen I*, Plaintiff argued
that "[t]hese redactions violate the segregability principle enshrined in 5 U.S.C. §
552(a)(8)(ii)(II)." Pls. Opp., *Osen I*, ECF No. 38, at 11. CENTCOM did not dispute that it generally
limited redaction boxes to the strike point itself, and (while maintaining that it "released all
segregable non-exempt information"), stated that it "will reconsider its withholdings on any

23

specific pages identified by Plaintiff where Plaintiff claims that the redaction boxes are unnecessarily large." CENTCOM Opp., *Osen I* (ECF No. 42) at 5-6. Thus, it was CENTCOM's position that limiting image redaction boxes to the strike point fulfilled CENTCOM's duty to produce all segregable information in pictures of vehicle damage—indeed, the district court presumably relied on CENTCOM's stated willingness to reconsider excessive image redactions, as it did not rule on the issue.

In this case, CENTCOM has redacted whole images, violating the principle of segregability as CENTCOM itself understood it in *Osen I*. CENTCOM now argues that "releasing partial photographs would also still reveal the parts of vehicles that were damaged, since the location of the redaction would correspond to the location of the damage." Frank Decl., ¶ 27. But Plaintiff made precisely this point during the appeal in *Osen I*,  arguing that CENTCOM's smaller redaction boxes were unsupportable, which argument CENTCOM opposed. Plaintiff argued that "[r]edaction boxes were often limited to the precise size of the strike point, making it obvious where the strike occurred," Appellee's Br., No. 19-1577, ECF No. 48 at 37. *See also id.* at 19 ("CENTCOM has never suggested that the images show anything other than the fact that penetration occurred and where it occurred on the vehicle—but both these facts are apparent from the precisely-placed redaction boxes and unredacted text accompanying the images.").

CENTCOM acknowledged that the reports "may describe … the general area where the EFP struck the armored vehicle," but argued its limited image redactions were sufficient to protect national security under b(1), leading to judgment in its favor. Appellant's Reply Br., No. 19-1577, ECF No. 61, at 16. CENTCOM cannot get judgment in its favor by opposing Plaintiff's argument, then turn around and *rely on Plaintiff's* argument to redact *more* information. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal

proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.") (citation omitted).

CENTCOM also argues that if it were "to release partial photographs by redacting only the damage to American military vehicles, enemy personnel would be able to figure out which vehicles were in the photos (which, as discussed elsewhere in this declaration, would also damage national security)." Frank Decl., ¶ 27. That "explanation" is addressed in the section on vehicle types, below. But CENTCOM's apparent (and unexplained) change in practice is stranger still because this information is, if anything, *more* outdated now than it was in *Osen I*.

Furthermore, Plaintiff can see CENTCOM's redactions are inappropriate because some of the images were also produced in *Osen I*, generally with far fewer redactions. For example, Plaintiff nominated the sample set of images at III:1:287-302. *See* Radine Decl., Ex. FF. This set includes 12 completely redacted photographs (a few are more acceptably redacted). CENTCOM also produced these in *Osen I* as I:1:234-249 with either limited or *no* redactions. *See* Radine Decl., Ex. GG. For example, I:1:234 is a completely unredacted close-up image of a door handle with an overlay pointing to "copper residue," a sign of an Iranian EFP; that same image is completely redacted at III:1:287, even eliminating the phrase "copper residue." In one telling example, CENTCOM appears to have added a whole-image redaction box over a smaller box similar to one in the same image as produced in *Osen I*, suggesting CENTCOM was aware it had made a more limited redaction, and added a larger one anyway. Radine Decl., Ex. II.

### B.     Redactions to Photographs of Weapons Evidence

CENTCOM has redacted photographs of weapons evidence, such as EFP components like initiator and triggering mechanisms, casings, and copper "slugs" or fragments, and IRAM components. In *Osen I*, CENTCOM produced **hundreds** of pages of unredacted photographs of

weapons evidence, *see* Radine Decl., Ex. JJ (providing dozens of examples), and only a dozen or so pages of clearly redacted images. Here, CENTCOM produced over 80 pages of unredacted images of weapons evidence—much lower than in *Osen I* presumably because CENTCOM here, unlike in *Osen I*, did not produce CEXC records[11]—and only about 35 pages of redacted images. Once again, a comparison of pages produced in *Osen I* and here shows that CENTCOM's redactions here are unjustified. Radine Decl., Ex. KK shows *originally unclassified* (1) photographs of IRAM components redacted in sample III:2:584 but produced unredacted in *Osen I* at I:5:37, and (2) "recovered copper slugs" redacted in sample III:1:515, produced unredacted in *Osen I* in I:1:35.[12] Other samples of redacted weapons evidence are in Radine Decl., Ex. LL (III:3:145, III:3:420-36, 438-62, 465-66 (the latter were likely originally unclassified)).[13]

### C.    Redactions to Photographs of Attack Scenes

CENTCOM has occasionally redacted images of attack scenes, including aerial/satellite photographs, images of blast seats, IRAM craters, and the surrounding area, like the "approach" to the area and four-image panels showing the area from the "cardinal directions." These redactions include the *originally unclassified* (1) IRAM craters in samples III:2:591 and III:2:600, produced unredacted in *Osen I* at I:5:44 and 53, respectively, Radine Decl., Ex. OO, and (2) "approach," "cardinal directions," and "blast seat" images redacted at samples III:3:58-59 and 63, produced without redactions *also in this case* at III:1:459-60 and 464, respectively, Radine Decl., Ex. PP.

---

[11]    In *Osen I*, CENTCOM produced dozens of records from a database relating to the Combined Explosives Exploitation Cell ("CEXC"), an in-theater explosives lab. Between that case and this, CENTCOM transferred that database to the U.S. Navy. Plaintiff is seeking those records from DoD via *Touhy* subpoenas in other matters.

[12]    In III:1:515, CENTCOM even redacted the caption "recovered copper slugs."

[13]    For some reason, CENTCOM has produced the image of a "107MM ROCKET MOTOR RECOVERED AT POI [point of impact] #2," III:3:437, but not the "107MM ROCKET MOTOR RECOVERED AT POI #4," III:3:462. Radine Decl., Ex. MM. Indeed, a slew of close-up IRAM images are unredacted in III:3:104-110 and III:2:739-43. Radine Decl., Ex. NN.

Aerial/satellite photographs were never redacted in *Osen I* and generally not in *Osen III*—Plaintiff located **335** unredacted images across the two cases—except for a handful of occasions, and for no apparent reason. Radine Decl. ¶ 21. For example, CENTCOM redacted the aerial photograph out of III:5:48 (but leaving in the precise MGRS coordinates) that it disclosed in I:3:886. In fact, the same photograph is clear in this case in III:5:49. *See* Radine Decl., Ex. QQ.

### 3.      Pages Withheld in Full

CENTCOM has withheld hundreds of pages in whole in this case, although it did not appear to withhold *any* in whole in *Osen I*. *See* Radine Decl. ¶¶ 22-25. These withholdings are among the most troubling because Plaintiff generally has little context with which to evaluate them. CENTCOM states that the "[p]rimary information at issue" in these withholdings is "[p]hotographs of battle-damaged U.S. military vehicles" (along with privacy redactions, addressed above). Vaughn Index at 8-9. However, because CENTCOM produced some of these pages in *Osen I*, Plaintiff (and the Court) can plainly see that the withholdings are inappropriate. For example, CENTCOM has withheld III:2:935-37 and III:2:956, but it previously produced these pages in *Osen I* at I:1:765-66 and 1764, respectively, with redactions limited to the strike points themselves—in fact, I:1:1764 has *no* b(1) redactions, and only privacy redactions. Radine Decl., Ex. N.[14] Incredibly, CENTCOM has now wholly withheld III:2:597, even though it is identical to I:5:50, which is not only unredacted, but is also *unclassified*.[15] Radine Decl. Ex. RR.

### 4.      Vehicle Model Numbers and Names

Despite almost never doing so in *Osen I*, CENTCOM has begun redacting the type of U.S.

---

[14]      The *Osen I* version has more pages of images than the *Osen III* version for some reason.

[15]      Likewise, III:2:579 from that production is withheld in full, but the same page is produced at I:5:32 with no redactions *at all*. Radine Decl., Ex. SS (CENTCOM also wholly redacted unclassified pictures from that attack in this case that it did not in *Osen I*, compare III:2:584/591/593-94/600 with I:5:37/44/46-47/53). *Id.*, Ex. TT.

military vehicles mentioned in the records (including in each of the casualty reports, which were all *originally* marked unclassified). These redactions sometimes include broad categories of vehicles, like the High Mobility Multipurpose Wheeled Vehicle ("HMMWV" or "Humvee") or Mine-Resistant Ambush Protected vehicle ("MRAP"), but nearly always redact out model names, like HMMWV models M1114 or M1151 or MRAP models like the RG-33 or Maxxpro. CENTCOM has redacted out most mentions of these vehicles, whether or not it was in an EFP attack or, if so, the vehicle targeted by the EFP. CENTCOM has also attempted to justify excessively redacting whole images of damaged vehicles in order to prevent the public from identifying the type of vehicle involved, as explained above at 25.

But, again, CENTCOM almost universally disclosed vehicle type in *Osen I*, including both targeted vehicles and other vehicles in the same convoy. The vehicle type is clear in 111 of the 113 EFP attacks in *Osen I* (no type was mentioned in the last two). Radine Decl. ¶¶ 26-30. As explained above, most redactions to images of damaged vehicles were limited to the actual strike point, making the vehicle type visible, and CENTCOM explicitly stated in *Osen I* that it would reprocess any excessively redacted images of damaged vehicles. *See supra* at 23-24.

CENTCOM now argues that providing "the vehicle type, alongside information regarding EFPs, would reveal to American adversaries specific and detailed information about the vulnerabilities of American war-fighting equipment that is not available in this form or with this level of specificity, and would illustrate the effectiveness of particular types of EFPs and combinations of critical variables." Frank Decl., ¶ 31. But CENTCOM does not explain, with *any* specificity, why that is true or what has materially changed since its disclosures in *Osen I*.

**5.    Originally Unclassified Records**

In this case, CENTCOM has begun redacting originally *unclassified* records, something it *never* did in *Osen I*. As noted above, all classified records at issue were automatically declassified

because they are over ten years old. However, some records (or portions of records) were *never* classified, and were marked "UNCLASSIFIED" when first created. These are records deemed not to pose a serious threat to national security *when they were created*, during a conflict that was then-ongoing. Now, CENTCOM is withholding information under Exemption b(1) on these entirely unclassified records, some whose provenance is approaching 20 years old.[16]

Indeed, of the 2,151 pages or portions of pages marked "unclassified" in *Osen I*, **two** bore national security redactions.[17] *See* Radine Decl. ¶ 32. In this case, 1,302 pages or portions of pages are marked unclassified and **221** of those unclassified pages or portions bear b(1) withholdings. *Id.* The fact that CENTCOM has redacted unclassified content less than 17% of the time strongly suggests that the reviewer simply did not realize the page was unclassified.

But CENTCOM nevertheless doubles-down and attempts to justify the withholdings anyway. It cites the "mosaic theory" found in section 1.7(e) of Executive Order 13,526. CENTCOM Br. at 13-14. As CENTCOM explains, that provision states that "compilations of information maintained by the government that are themselves unclassified may be classified 'if the compiled information reveals an additional association or relationship that meets the standards for classification under this order that is not otherwise revealed in the individual items of information.'" *Id.* (quoting § 1.7(e)). CENTCOM thus suggests, but never explains how, this unclassified information, read with some unspecified other information, poses serious damage to national security. *See Berman v. C.I.A.*, 501 F.3d 1136, 1143 (9th Cir. 2007) ("To be sure, the CIA's invocation of the mosaic theory does not excuse it from meeting its burden of proof or from

---

[16]     Unclassified pages bear privacy redactions, which are not "classifications." Privacy issues are addressed above in section I.B.

[17]     The two pages, attached here as Radine Decl. Ex. VV, were presumably mistakes. For example, on the second, it is unclear what portion of the page is unclassified.

its obligation to provide a reasonably specific explanation of why the exemption applies.").

But in *Osen I*, CENTCOM specifically refuted Plaintiff's suggestion that it was attempting to withhold unclassified material:

> [C]ontrary to Plaintiff's argument, *see* Pl. Mem. at 20-21, CENTCOM did not withhold any information pursuant to FOIA Exemption 1 on the ground that it represented a "compilation of items of information that are individually unclassified," E.O. 13,526 § 1.7(e). At no point in its opening memorandum or in either of the Ferrell declarations did CENTCOM invoke § 1.7(e) as a basis for a withholding decision.

CENTCOM *Osen I* Reply Br., No. 17-cv-4457, ECF No. 42, at 18. CENTCOM does not explain why it now withholds unclassified information but only 17% of the time, or why these records—now even older than those produced in *Osen I*—must be withheld under the mosaic theory when CENTCOM explicitly did do so not before.[18]

The samples further confirm that the redactions are inappropriate. Samples III:2:584, 591, 593-94, and 600 are all complete redactions of unclassified images, largely "photographs of the scene," from a single IRAM attack. *All* of them were *fully* disclosed in *Osen I* as I:5:37, 44, 46-47, and 53, respectively, Radine Decl., Ex. TT (it also withheld some of these unclassified pages in whole, see section C).[19] Samples III:1:108-09 are "photographs of scene" of another attack (worse still, they appear to be photographs of print-outs of photographs). *See* Radine Decl., Ex. XX. Other examples include redactions to unclassified casualty reports, *see* Radine Decl. Ex. YY (III:1:370-72, III:3:68-70, III:6:294-95 and 231, III:7:19 and 142). *See also* III:1:465, mentioned above.

---

[18]     Agencies using the mosaic theory have sought review "closer to judicial acquiescence" in some courts, "to insulate all but the most outrageous mosaic arguments from scrutiny." David E. Pozen, *The Mosaic Theory, National Security, and the Freedom of Information Act*, 358 Yale L. J. 628, 653 (2005). But other courts have criticized its overuse, such that "there seems to be no limit to the Government's [mosaic] argument." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 709 (6th Cir. 2002).

[19]     The last is the north view of a 12-foot crater from the North; it is a mystery why CENTCOM did not withhold the East and South views at III:2:598-99. Radine Decl., Ex. WW.

6.     **Locations and CIDNE Tracking Numbers**

The precise locations of incidents are generally given in three ways: Military Grid Reference System ("MGRS") coordinates, maps, and text descriptions. This information appears thousands of times in the CENTCOM productions and is nearly never redacted—Plaintiff located over **2,400** pages in which MGRS coordinates are given without redaction. Radine Decl. ¶¶ 33-35. This information is important because the geographical location of particular attacks provides an important indication of whether the attack took place in an area either under the control of IRGC proxy groups or one where those terror cells was active during the period when the attack occurred.

CENTCOM's Frank Declaration and *Vaughn* Index does not even attempt to justify redacting locations.[20] The best hint as to the purpose for doing so comes in its justification for redacting parts of CIDNE tracking numbers, which often contain MGRS coordinates.

CIDNE tracking numbers are used to associate records relating to a given attack and are important to Plaintiff and CENTCOM in requesting and locating records.[21] Although CENTCOM *never* redacted any of the hundreds of CIDNE tracking numbers in *Osen I* and only **13** in this case, out of about **745** in total, for a redaction rate of about 2%, Radine Decl. ¶¶ 37-38, CENTCOM nevertheless attempts to justify the handful of arbitrary redactions, instead of simply releasing the information. CENTCOM's *Vaughn* index at 7 states that the "Primary information at issue" in the sampled CIDNE redactions is that "tracking information that would reveal locations of active

---

[20]     Routing information refers to text descriptions of routes units took either before or after an attack. For example, one reads: "a CF resupply convoy from [unit] was struck by an EFP IVO 38S MB 61875 26170, while heading East on ROUTE CHRISTY. The convoy was from [Forward Operating Base] KALSU en route to [Patrol Base] ZULU when the lead vehicle (MRAP) was struck by an IED." I:1:500. CENTCOM redacted routing rarely, and never for a clear reason—for example, it redacted route "Vernon" in III:1:286, but disclosed it in the same attack in III:1:276, 277, 293, 297. *See* Radine Decl., Ex. ZZ.

[21]     For example, CI:2:130 states, "FOR MORE INFORMATION, REGARDING THIS INCIDENT REFER TO SIGACT TRACKING NUMBER 20070518113538SMB3710190304." *See also* III:1:498 ("SEARCH OF SIGACTS REVEALED THIS ATTACK WAS REPORTED AS CIDNE SIGACTS TRACKING NUMBER 20090517215538SMB3518293325").

military facilities or other operational locations," presumably because, as stated, they are sometimes made using MGRS coordinates.

But the redactions to MGRS coordinates in CIDNE tracking numbers or elsewhere is inexplicable. For example, in III:1:314, CENTCOM redacted the MGRS coordinates of a blast seat. Radine Decl., Ex. AAA. First, it is hard to imagine what our nation's enemies would do with that specific information. Second, the same page states – unredacted – "An EFP exploded at 38S MB 39007 78150." Third, the redacted blast seat is printed in an overlay with an arrow pointing to a precise spot on a map of "Saydiyah, West Rashid," which is, if anything, more revealing (maps with precise MGRS coordinates are routinely disclosed; *see* Radine Decl., Ex. BBB (III:7:177)).

Other examples are just as strange. In III:1:490, CENTCOM redacts from a 10:40pm update the location of "a possible secondary EFP" (disclosed in the same record in *Osen I*, I:4:864). Radine Decl. Ex. CCC. Thus, the redaction is to the location of where an EFP *could* have been 13 years ago, which hardly seems like a national security threat *now*; but that information did not even stay accurate for 13 *minutes*—a 10:52pm update states "there is no secondary IED." *Id.* Notably, CENTCOM does not redact the location of the *actual* EFP used in the incident. *See id.* (III:1:489).

The redactions to the CIDNE tracking numbers are no better. In the first, the CIDNE tracking number is redacted, as are the MGRS coordinates on the next page. Radine Decl., Ex. DDD. But the same record was produced without (these) redactions in *Osen I. Id.*[22] As is clear from both versions of the record, the location is unremarkable: the vehicle was struck on while on patrol in "an eastbound convoy on [route] Mets." *Id.* Nearly all of the dozens of EFP attacks at issue happened to patrols moving about Iraq. CENTCOM does not suggest there are "active"

---

[22]     In reproducing the document in this litigation, CENTCOM has redacted out the vehicle type ("UAHMMWV") and the phrase "copper slug and several secondary fragments," both visible in Radine Decl. Ex. DDD.

operations occurring there or that some clandestine operation would be compromised by locating an event that occurred on a particular stretch of road over 10 years ago.

In the second, the tracking number and MGRS coordinates are redacted from a text box *affixed to a clearly labeled map showing the precise location of the attack*. Radine Decl., Ex. EEE. The page title states that it is an indirect fire attack "ON COP [combat outpost] BUSHMASTER IVO [in the vicinity of] NEW BAGHDAD." *Id.* Further, CENTCOM does not claim that COP Bushmaster is an "active" U.S. military site. *See* Radine Decl., Ex. FFF (official DOD document stating that "Camp Bushmaster *was* a camp located roughly 24 kilometers south of the city of An Najaf"). It is an apparently unremarkable COP that appears elsewhere in the CENTCOM records. Finally, among the hundreds of unredacted CIDNE tracking numbers and MGRS coordinates, the locations of countless US military installations are given. *See* Radine Decl., Ex. GGG (I:3:782 (giving the tracking number for an indirect fire attack on "FOB Warhorse"); III:3:97 (giving the MGRS coordinates for an indirect fire attack on a COP)).

Alone, these nonsensical redactions would not matter significantly, but taken with CENTCOM's other inexplicable redactions and *its refusal to simply acknowledge error*, the pattern is very troubling.

### 7.   Units and Call Signs

CENTCOM stated that although it "withheld unit call signs in category 6 records," "upon further review, [it] determined that the withheld call signs, but not the unit names, may be released in these records" because "CENTCOM no longer judges that its release would risk damage to national security." Frank Decl. ¶ 24. Indeed, call signs were generally not redacted in *Osen I*—but neither were unit names.

In fact, and more striking here, is that unit names do not appear to be redacted *in this case*. On further review, it seems that all of the samples at issue are in fact call signs, and not unit names:

- In several, the unit is visible, making clear the redaction is to the call sign. For example, III:4:171 states: "Unit Call Sign: [redacted] (57th MP CO)." The "57th MP CO" is the unit; the redacted information is almost certainly the "Call Sign." The same applies to III:1:24, III:6:213, and III:6:342. Radine Decl., Ex. HHH.

- III:6:82-83 and III:6:95-96 are from the same attack, which records were also produced in *Osen I*, where the information was disclosed at I:1:1429-30 and I:1:1409-10, respectively. Radine Decl. Ex. III. Those versions show the redactions were to call signs "Hammer 00" and "Hammer 66." Indeed, even on III:6:96, the unit is given at the top of the page: 1/15/IN. *Id.*

- III:1:275 and 443 both say: "Call Sign: [redacted]"; the unit is not redacted. Radine Decl., Ex. JJJ.

CENTCOM does not specify which, if any, of the sampled redactions are to unit names, and as near as Plaintiff can tell, its position is just another example of *ex post facto* justification made without even reviewing the actual information it redacted.

If there *are* any redactions of unit names, CENTCOM must explain why it redacted those and not the hundreds of others. *See* Radine Decl. ¶¶ 39-40. But because there appear to be none, granting CENTCOM summary judgment on redactions not at issue (or that were never made) would again constitute an advisory opinion.

8.      **Damage to Vehicles**

On certain occasions, CENTCOM has redacted text descriptions of damage to vehicles, whereas it generally did not do so in *Osen I*, or even in this case. Radine Decl., Ex. KKK contains two examples—in sample III:6:2, CENTCOM redacted the fact that a HMMWV returned to a COP "to replace a flat tire"; in sample III:6:252, CENTCOM redacted the following: "Vehicle was slightly damaged. EFP left copper risidule [sic] in the engine block and blew tires. Vehicle is able to move on its own." Both were HMMWVs. Thus, CENTCOM has redacted the fact that a weapon capable of "punctur[ing] inches of metal plating like water through snow," *supra* at 5, could blow

truck tires. To be clear, HMMWV tires are not a secret military technology—they are for sale.[23]

The 300 sample pictures provided in Radine Decl., Ex. EE show that CENTCOM often produced detailed pictures of vehicular damage (including, naturally, blown tires, as in the completely unredacted image at I:1:1741 or, in this case, in III:2:851). Plaintiff identified nearly **300** pages (including dozens in this case) with disclosed text descriptions of EFP damage to vehicles, from blown tires, engine and armor damage, and total losses. Radine Decl. Ex. ¶¶ 41-43. Radine Decl., Ex. LLL provides several examples from this case: III:2:627 ("causing the engine block to be destroyed and all tires to be damaged"), III:2:638 ("Shrapnel severed hoses and damaged engine, driver side front tire flat, shrapnel damage to right side armor"); III:1:240 (engine damage), III:1:383 (blown tires).

The other sample objections are no more sensible. In sample III:4:183, CENTCOM redacted the word "extensive" from the phrase "the blast caused extensive damage" (CENTCOM failed to redact it out of the same record at III:3:166); but "extensive" vehicular damage is clear from hundreds of pictures and descriptions—and it seems apparent from the fact that the explosion in III:4:183 killed one soldier and wounded three others. Radine Decl., Ex. UU. Likewise, in sample III:6:36, CENTCOM redacted the phrase "[d]ama[ged] veh[icle] will no longer move under own power"—again, an unexceptional result where the explosion killed a soldier ("1 x US DOW [died of wounds]"). Radine Decl., Ex. HH.

## CONCLUSION

For the reasons given above, the Court should grant Plaintiff's cross-motion for summary judgment and deny CENTCOM's motion for summary judgment.

---

[23]     *See* https://gov.goodyear.com/tires/product-details?PL=108048, www.boyceequipment.com/hummer-tires.

Dated:          New York, New York
                July 6, 2022

                                      **OSEN LLC**

                               By     /s/ Michael J. Radine
                                      Michael J. Radine
                                      Dina Gielchinsky
                                      1441 Broadway, Suite 6022
                                      New York, New York 10018
                                      Phone: (212) 354-0111
                                      Fax:    (201) 265-0303

                                      *Attorneys for Plaintiff*