UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
OSEN LLC,                                                         :
                                                                  :
                                  Plaintiff,                      :
                                                                  :
                                                                  :        19 Civ. 6867 (JPC)
                -v-                                               :
                                                                  :        OPINION AND ORDER
                                                                  :
                                                                  :
UNITED STATES CENTRAL COMMAND,                                    :
                                                                  :
                                  Defendant.                      :
                                                                  :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

   Plaintiff Osen LLC, a law firm, brings this action under the Freedom of Information Act

("FOIA"), 5 U.S.C. § 552, seeking the release of records held by Defendant United States Central

Command that document attacks against American servicemembers stationed in Iraq. Since this

lawsuit was initiated, the parties have significantly narrowed their dispute. What remains for the

Court to resolve is whether Defendant may withhold information, in the form of photographs,

graphics, and text, depicting or otherwise describing vehicles that were damaged by improvised

explosive devices ("IEDs") that used explosively formed penetrators ("EFPs"), where that specific

information has not already been produced to Plaintiff (the "Vehicle Information"). Defendant

has withheld production of the Vehicle Information based on its determination that public

disclosure could reasonably be expected to expose vulnerabilities and capabilities of U.S. military

vehicles when attacked by EFPs, including specific details concerning the effectiveness of EFPs

in penetrating the armor of those vehicles, thereby assisting the ability of adversaries of the United

States to more effectively target U.S. and allied forces.

Each party has now moved for summary judgment.    For the reasons that follow, Defendant's motion is granted, and Plaintiff's motion is denied.

## I. Background

### A.    Facts[1]

Plaintiff allegedly "represents hundreds of U.S. service members killed or injured in terrorist attacks while serving in Iraq . . . along with members of their families." Dkt. 1 ("Compl.") ¶ 2.  In its capacity as their counsel, Plaintiff files lawsuits against the Islamic Republic of Iran ("Iran") seeking compensation for injuries those servicemembers suffered in attacks for which, Plaintiff's clients believe, Iran bore ultimate responsibility. *See, e.g., Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019).  In those lawsuits, Plaintiff attempts to demonstrate Iran's responsibility for the attacks by proving that the assailants employed EFPs, a weapon characteristically supplied by Iran. *Id.* at 14-15, 25-46.  And in order to acquire evidence about the weapons used in the attacks, Plaintiff requests "a variety of investigatory and other records" relating to the attacks from Defendant, pursuant to FOIA. Dkt. 46 ("Frank Decl.") ¶ 6.

Between November 2016 and June 2017, Plaintiff submitted 260 FOIA requests to Defendant seeking records documenting attacks on American servicemembers whom Plaintiff represented. *Osen I*, 375 F. Supp. 3d at 414. Defendant made substantial disclosures of nearly 8,000 pages of records in response to those requests. *Id.* Defendant did not disclose all the records

---

[1] Because the parties have not submitted statements pursuant to Local Civil Rule 56.1, these facts are drawn from the exhibits submitted by the parties, from relevant provisions of federal law, and from decisions handed down in cases in which Plaintiff either was a party, including an earlier FOIA case between the same parties, *see generally Osen LLC v. U.S. Cent. Command* ("*Osen II*"), 969 F.3d 102 (2d Cir. 2020); *Osen LLC v. U.S. Cent. Command* ("*Osen I*"), 375 F. Supp. 3d 409 (S.D.N.Y. 2019), *rev'd in part and vacated in part*, *Osen II*, 969 F.3d 102, or served as counsel.  In addition, the Court occasionally draws upon allegations in the Complaint not admitted in the Answer, without accepting their truth, solely for the purpose of providing background.

Plaintiff sought, however. *Id.* at 414-15. Under FOIA, agencies are not required to release all information requested from them; instead, federal law sets forth nine exemptions defining categories of information to which FOIA's disclosure requirement does not apply. *See* 5 U.S.C. § 552(b). Thus, Defendant withheld certain additional records responsive to Plaintiff's requests, which, it claimed, fell within certain of those exemptions. *Osen I*, 375 F. Supp. 3d at 414-15. In particular, the first such exemption ("Exemption 1") authorizes the withholding of information that is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and is "in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Among other withholdings, Defendant redacted four categories of classified information contained in the records documenting the attacks—information about convoy operations, information about certain equipment designed to counter IEDs, information about how EFPs are designed and function generally, and information specifically about the ability of EFPs to penetrate the armor used to protect American military vehicles. *Id.* at 415. In *Osen I*, Plaintiff challenged Defendant's withholding of a subset of this information: images of EFP strikes and information regarding the size of the EFPs. *Id.* at 418. The district court agreed with Plaintiff that the records sought were not exempt from disclosure under FOIA because certain materials had already been disclosed and thus were not protected by FOIA under the official disclosure doctrine. *Id.* at 418-23. On appeal, however, the United States Court of Appeals for the Second Circuit reversed the district court in part, finding that Defendant had not waived Exemption 1 pursuant to the official disclosure doctrine, and approved certain of Defendant's withholdings under Exemption 1. *Osen II*, 969 F.3d at 109-14, 116.

Between April 2017 and May 2019, Plaintiff submitted over 180 additional FOIA requests to Defendant. Frank Decl. ¶ 6; *see* Compl., Exh. A (listing requests). Once again, Defendant

produced a considerable volume of records responsive to Plaintiff's requests, Frank Decl. ¶ 9, yet redacted certain information in those records that, it believed, fell within at least one FOIA exemption and thus could properly be withheld, *id.* ¶ 11. The information Defendant withheld fell into multiple categories, including identifying information about individual servicemembers and American military units, and information pertaining to EFPs and to the countermeasures taken against them. *See* Dkt. 46-1 (*Vaughn* index of withheld information). As relevant to this Opinion and Order, Defendant withheld information about American military vehicles that had been attacked by EFPs. *See* Dkt. 69 ("Unclassified Doyle Declaration") ¶ 7. Certain, more limited information about those vehicles had also been withheld from the disclosures challenged in *Osen I*, 375 F. Supp. 3d at 416, and upheld in *Osen II*, 969 F.3d at 107-08, 114-16. During the years between that litigation and the present case, however, Defendant changed its view as to what specific parts of records concerning vehicle attacks are classified, are exempt from disclosure under FOIA, and therefore may be redacted in the records produced to Plaintiff. Unclassified Doyle Declaration ¶¶ 12-13. In particular, the productions that Plaintiff challenges in this case contain more extensive redactions, in multiple respects, than the redactions Defendant applied to the disclosures challenged in *Osen I*.

In the disclosures challenged in *Osen I*, Defendant redacted "images that show damage caused by EFPs in these terrorist attacks—specifically, the 'strike points' where an EFP penetrated an armored vehicle." *Osen II*, 969 F.3d at 107; *accord* Unclassified Doyle Declaration ¶ 12. In those disclosures, however, Defendant left unredacted images of "undamaged portions of vehicles" and at least "some textual information about the types of vehicles damaged in attacks and descriptions of the damage." Unclassified Doyle Declaration ¶ 12. By early 2020, however, Defendant "determined that the redactions previously applied to photographs and graphics of the

type sought by Plaintiff were not sufficient to avoid revealing information about the vulnerabilities and capabilities of military equipment and infrastructure." *Id.* ¶ 13. Defendant reasoned that photographs in which only the strike point was redacted nonetheless revealed "information about the location(s) of the battle damage on the targeted/damaged vehicle, as well as the types of vehicles and locations most vulnerable to EFPs." *Id.* ¶ 15. According to Defendant, similar information would be revealed by textual descriptions of the vehicles damaged in such attacks or of the nature of the damage they suffered. *Id.* ¶ 11. Defendant consequently decided to redact entire images of vehicles damaged in EFP attacks, not just the portions of those images depicting the strike points, *id.* ¶ 10, and to redact text in the records that communicated that same information, *id.* ¶ 11.

B.    Procedural History

Plaintiff filed the Complaint that initiated this action on July 23, 2019. *See* Compl. Following submissions by the parties, *see* Dkts. 14-15, 18, on February 4, 2020, the Honorable Katherine Polk Failla, to whom this case was then assigned, set a schedule requiring Defendant to produce 500 pages every two months until it had fully responded to Plaintiff's requests.[2] Dkt. 19. On June 14, 2021, the parties reported that Defendant had completed its initial production, that Plaintiff had begun producing its objections to that production, and that Defendant had begun reviewing those objections. Dkt. 28. On December 17, 2021, the parties reported that they had engaged in negotiations regarding the withheld records, and while they had successfully reduced the scope of their dispute, disagreements over the permissibility of certain withholdings remained for the Court to resolve on summary judgment. Dkt. 36. Defendant filed its motion for summary

---

[2] This case was transferred to the undersigned on September 29, 2020. *See* Notice of Case Reassignment dated Sept. 29, 2020.

judgment on May 26, 2022, Dkts. 44-46, and Plaintiff filed its cross-motion for summary judgment on July 6, 2022, Dkts. 49-51.

Rather than proceeding with the remainder of summary judgment briefing as scheduled, however, on July 22, 2022, the parties requested that summary judgment briefing be stayed *sine die* so that Defendant could reprocess Plaintiff's requests and potentially narrow the issues in dispute. Dkt. 53. Following that reprocessing, the parties explained, only a single issue remained for the Court to decide, which involves what is referred to herein as the Vehicle Information:

> whether the following types of information may be proper[l]y withheld pursuant to FOIA exemption 1, 5 U.S.C. § 552(b)(1):
>
> - The specific types of military vehicles identified in produced records;
> - Redactions of images of vehicles beyond those necessary to withhold images of "strike points" . . . ;
> - Text descriptions of battle damage to military vehicles; and
> - Information falling within these categories that appears in materials previously marked "unclassified."[3]

Dkt. 61 at 1. On February 17, 2023, each party filed a renewed motion for summary judgment addressing only that question. Dkts. 62-64, 66, 67 ("Pl. Br."), 68. Accompanying Defendant's motion was an unclassified declaration from Major General David S. Doyle, Defendant's Chief of Staff, who is "responsible for, among other things, protecting sensitive military planning, operations, and intelligence information against unauthorized disclosure" and has been designated

---

[3] Defendant does not intend to withhold or otherwise redact material that had previously been disclosed to Plaintiff, even if Defendant's current standards governing appropriate redactions would require that material to be redacted. Unclassified Doyle Declaration ¶ 13 n.2 ("To the extent a photograph, graphic, or other vehicle information was previously released to Plaintiff in redacted form, it is not being withheld in full in this case. [Defendant] does not intend to withhold images or information where the same images or information were previously released to Plaintiff."); Dkt. 70 ("Deft. Br.") at 2 ("To be clear, [Defendant] does not intend to withhold vehicle information that has previously been produced under FOIA, even if it falls within these disputed categories."); *see also* Dkt. 61 at 1 n.1 (same in a joint letter).

an Original Classification Authority by the Secretary of Defense. Unclassified Doyle Declaration ¶¶ 1, 5.[4]  On the same date, Defendant filed a Notice indicating that it had further submitted a classified declaration from Major General Doyle ("Classified Doyle Declaration") for the Court's *in camera, ex parte* review. Dkt. 65. Because a footnote in the initially filed version of the unclassified declaration from Major General Doyle incorrectly stated the authority relied upon to classify certain redacted information in the records Plaintiff seeks, *see* Dkt. 64 ¶ 15 n.3, on March 2, 2023, Defendant submitted a new version of that declaration with a corrected footnote (and no further substantive changes), *see* Unclassified Doyle Declaration, and a revised version of its opening brief that corrected a discussion related to that footnote, *see* Deft. Br. On March 3, 2023, each party submitted a brief in opposition to the opening brief filed by the other. Dkts. 71 ("Pl. Reply"), 72, 73 ("Deft. Reply").

## II.  Legal Standard

FOIA vests federal courts with "jurisdiction to enjoin [a federal] agency from withholding agency records and to order the production of any agency records improperly withheld . . . ." 5 U.S.C. § 552(a)(4)(B). The statute requires disclosure of any requested "agency records" unless they fall within one of FOIA's enumerated exemptions. *See Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999); *Adamowicz v. I.R.S.*, 672 F. Supp. 2d 454, 460-61 (S.D.N.Y. 2009), *aff'd*, 402 F. App'x 648 (2d Cir. 2010). "The government bears the burden of demonstrating

---

[4] Major General Doyle explains that U.S. Central Command is one of eleven combatant commands of the United States armed forces, responsible for "direct[ing] and enabl[ing] military operations and activities with allies and partners in support of the National Defense Strategy to increase regional security and stability in support of enduring United States interests within its Area of Responsibility ('AOR')." Unclassified Doyle Declaration ¶ 2. U.S. Central Command's AOR currently includes twenty-one nations in the Middle East, Central and South Asia, and the strategic waterways that surround them, and prior to 2008, also included seven African nations. *Id.*

that an exemption applies to each item of information it seeks to withhold, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Florez v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016) (citation omitted). FOIA thus allows public access to information held by agencies of the federal government while seeking "to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).

Courts typically resolve FOIA disputes on motions for summary judgment. *N.Y. Times Co. v. U.S. Dep't of Just.*, 550 F. Supp. 3d 26, 31 (S.D.N.Y. 2021). In deciding such motions, a court "may grant summary judgment in favor of an agency on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Cuomo*, 166 F.3d at 478 (internal quotation marks omitted). Thus, where the agency's "submissions are adequate on their face, district courts may forgo discovery and award summary judgment on the basis of affidavits." *N.Y. Times Co.*, 550 F. Supp. 3d at 31 (internal quotation marks omitted). Conversely, "[s]ummary judgment in favor of the FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 398 (S.D.N.Y. 2014) (citation omitted).

### III. Discussion

A significant focus of Plaintiff's attacks on Defendant's withholding of the Vehicle Information does not entail directly applying the rules governing the FOIA exemption for classified information, but rather entails arguing that Defendant cannot withhold the Vehicle

Information now given its past disclosure of similar information in response to the requests litigated in *Osen I* and *Osen II*. The Court therefore begins with those arguments. Having concluded that Defendant's past disclosures do not preclude it from redacting the Vehicle Information in response to Plaintiff's present requests, the Court then examines whether Exemption 1 authorizes those withholdings, and concludes that it does.

## A.   The Effects of Defendant's Prior Disclosures

Plaintiff argues that Defendant may not redact the Vehicle Information by relying on the fact—which Defendant does not deny, *see* Deft. Br. at 1—that Defendant would not have redacted such information had these requests been made at the time of those litigated in *Osen I* and *Osen II*, and that Defendant actually did release similar information at that time. Pl. Br. at 2-3. Plaintiff's primary legal theory for why Defendant cannot redact the Vehicle Information in light of this changed position sounds in waiver, *see id.* at 3; in addition, Plaintiff suggests that Defendant's redactions are also barred under various species of estoppel, *id.* at 6-7 (collateral estoppel), 18-19 (judicial estoppel). The Court analyzes each theory in turn.

### 1.   Waiver

Under the official disclosure doctrine, "an agency may not invoke Exemption 1 'to prevent public disclosure when the government has *officially* disclosed the *specific* information being sought.'" *Osen II*, 969 F.3d at 109 (quoting *Hudson River Sloop Clearwater, Inc. v. Dep't of* Navy, 891 F.2d 414, 421 (2d Cir. 1989)). However, the test governing when the official disclosure doctrine applies "is a strict one: Classified information that a party seeks to obtain or publish is deemed to have been officially disclosed only if it (1) is as specific as the information previously released, (2) matches the information previously disclosed, and (3) was made public through an official and documented disclosure." *Id.* (internal quotation marks and brackets omitted). Defendant argues that its prior disclosures in response to the requests litigated in *Osen I* do not

trigger the official disclosure doctrine in this case because the second requirement is not met: the information Plaintiff now seeks—*i.e.*, the Vehicle Information—does not match the information previously disclosed in response to Plaintiff's prior requests. Deft. Br. at 11-12.

The Court's resolution of this dispute is directly governed by the Second Circuit's holding on the *exact same question* in *Osen II.* In that case, Plaintiff "relied on several past DoD disclosures of images of EFP damage to argue that [Defendant] waived its right to withhold similar EFP damage images from other attacks." 969 F.3d at 107-08. The district court accepted Plaintiff's argument, holding that because a different unit within the Department of Defense had disclosed photographs revealing "the precise *type* of information" Defendant sought to redact, FOIA required the "disclosure of any similar photographs of EFP strikes withheld by" Defendant. *Osen I*, 375 F. Supp. 3d at 423-24. The Second Circuit disagreed. For two records to "match" in the sense required for the official disclosure doctrine to apply, it held, they must "present the same information about the same subject." *Osen II*, 969 F.3d at 112. And while "[e]ach set of EFP strike point images provides the same kind and type of information about the attack it memorialized[,] . . . the subject matter, facts, and details conveyed by one set of images are unique to that attack and are different from the subject matter, facts, and details conveyed by the other set of images." *Id.* Thus, "the information does not match." *Id.* "[A]n official disclosure of EFP strike point images waives Exemption 1 only as to the same information about the same attack that those images memorialize. That same disclosure does not constitute a subject matter waiver for all images of EFP damage across all terrorist attacks." *Id.* at 114.

The facts presented here on the question of official disclosure are materially indistinguishable from those presented in *Osen II*.[5] Relying on past disclosures of information about some EFP attacks, Plaintiff asks the Court to order production of records containing information about *different* EFP attacks. But that "information does not match," because "each disclosure says nothing about the attacks that the other disclosures depict." *Id.* at 112. Consequently, "an official disclosure of EFP strike point images waives Exemption 1 only as to the same information about the same attack that those images memorialize." *Id.* at 114. Under that rule, as Defendant recognizes, it cannot "withhold vehicle information that has previously been produced under FOIA." Deft. Br. at 2. But because under *Osen II* the disclosure of information about an EFP attack triggers a waiver of Exemption 1 only as to "the same information about the same attack," Defendant's past disclosure of similar vehicle information relating to different attacks plainly does not preclude it from redacting the Vehicle Information that Plaintiff seeks in this case.

While the official disclosure doctrine is well established, Plaintiff does not explicitly rest its waiver theory on that doctrine in its briefing. In *Osen II*, the Second Circuit observed that "[t]he more images of different attacks that become available to the public, the more adversaries might learn about the Army's weaponry." 969 F.3d at 116. It cautioned, however, that "the more images of individual attacks that components of DoD voluntarily release on a piecemeal basis, the less compelling this position will become." *Id.* Citing this latter statement, Plaintiff claims that

---

[5] In *Osen II*, Plaintiff relied on prior disclosures made not by Defendant but by a different unit within the Department of Defense. 969 F.3d at 108-09. But while the Second Circuit expressed some skepticism that the official disclosure doctrine could bar one subcomponent of the Department of Defense from withholding information only because a *different* subcomponent had previously disclosed the same information, *see id.* at 109 n.3; *id.* at 116-19 (Menashi, J., concurring), Defendant did not raise that argument on appeal and thus the Second Circuit did not address it, *id.* at 109 n.3. *Osen II* therefore cannot be distinguished from this case on that basis.

"repeated disclosures of a type of information can constitute a waiver as to that type of information unless CENTCOM can provide a reason to withhold that information only some of the time." Pl. Br. at 3; *see also id.* at 11 (quoting *Osen II*, 969 F.3d at 116). Because this assertion would be incorrect as a statement of the official disclosure doctrine, and because at other points Plaintiff suggests that the Second Circuit accepted the broader theory of waiver employed by the district court in *Osen I, e.g.*, Pl. Br. at 10 (claiming, without citation, that "the Circuit did not dispute the district court's analysis that repeated disclosures can constitute waiver"), Plaintiff appears to suggest that, in the quoted passage from *Osen II*, the Second Circuit recognized a second, distinct type of waiver not governed by the strict matching requirement of the official disclosure doctrine. In the Court's view, however, Plaintiff has misread *Osen II*: the quoted passage does not pertain to waiver at all but instead pertains to the proper invocation of Exemption 1. Thus, though the Court must consider how the prior production of similar information bears on whether Defendant may withhold the Vehicle Information under Exemption 1, Plaintiff errs in suggesting that waiver is the legal doctrine that governs the relevance of Defendant's prior production to its present withholdings.

As an initial matter, the structure of *Osen II* unambiguously conveys that the passage Plaintiff cites is not about waiver. The "Discussion" section of that decision is divided into two parts. The first, entitled "Official Disclosure Doctrine," addresses Plaintiff's arguments as to waiver; it concludes, as discussed, by holding that "an official disclosure of EFP strike point images waives Exemption 1 only as to the same information about the same attack that those images memorialize. That same disclosure does not constitute a subject matter waiver for all images of EFP damage across all terrorist attacks." 969 F.3d at 114. The second, entitled "FOIA Exemption 1," begins by noting that "[r]esolution of Osen's claim of waiver does not bear on the

12

question of whether [Defendant] properly invoked Exemption 1 by withholding images of EFP damage." *Id.* This second part of the opinion's "Discussion" section then goes on to answer that distinct question by directly applying the principles governing Exemption 1 to the information that Defendant had sought to redact. *Id.* at 114-16. Unsurprisingly, the Second Circuit's analysis of when past disclosures waive an agency's right to make future withholdings appears in the former part of its opinion, which analyzes the waiver issue. And had the passage from *Osen II* that Plaintiff quotes addressed when past disclosure operates as a waiver for the purpose of future withholdings, that passage would have appeared in the first part of *Osen II*. Instead, the passage appears in the second part, indicating that it concerns the application of Exemption 1, not waiver.

The substance of that passage further makes clear that it addresses the application of Exemption 1, not waiver. As the Court will explain, whether Defendant properly invoked Exemption 1 as to the Vehicle Information depends on its ability to logically and plausibly articulate why that withheld information was exempt from disclosure. *E.g.*, *id.* at 114. Immediately before the quoted passage, the Second Circuit summarized Defendant's explanation of why further disclosure would threaten national security—namely, that additional disclosures provide American adversaries with additional information they can exploit in attacking American servicemembers. *Id.* at 116. Then, it noted that as the volume of voluntary disclosures of similar information mounted, "the less compelling this position"—that is, Defendant's justification for its withholdings—"will become."[6] *Id.* That point would be irrelevant in analyzing an argument for waiver, a doctrine that operates independently of the merits of the underlying withholdings. But

[6] Although Plaintiff modifies this quotation to read "the less compelling [CENTCOM's non-waiver] position," Pl. Br. at 3, it presents no argument for interpreting the passage as a reference to Defendant's position as to waiver rather to Defendant's justification for classifying the information Plaintiff sought in *Osen I*.

it is obviously relevant to the propriety of Defendant's invocation of Exemption 1, which depends on whether the agency can present a compelling justification for its redactions. And though the Second Circuit did not elaborate as to why the volume of past disclosures might be relevant to the logic or plausibility of future withholdings, possible explanations are obvious. The repeated, voluntary disclosure of similar information by multiple agencies suggests that in those agencies' estimation national security does not justify the challenged withholdings. Alternatively, the continued withholding of information might become illogical if American adversaries could equally well threaten national security using information already available to them—such as an agency's voluminous past disclosures—regardless of whether any future disclosures were made. Thus, the existence of past disclosures may be relevant to whether withholding is justified as a matter of policy, and courts review "the legitimacy of those types of policy judgments . . . when determining whether an entity has appropriately claimed an exemption." *Id.* at 113 n.8. But that is simply a distinct inquiry from waiver; under waiver doctrine, "the specificity and matching prongs . . . require [courts] to look at the specific information that has been disclosed previously— not presumed policy judgments underlying those disclosures—to establish waiver." *Id.* And because the specific information Defendant previously disclosed does not match the information it now seeks to withhold, it has not waived its right to withhold that information.

### 2.   Estoppel

In its briefing, Plaintiff cites two estoppel doctrines that it argues preclude Defendant from withholding the Vehicle Information in response to Plaintiff's requests. Neither doctrine entitles Plaintiff to the relief it seeks.

First, Plaintiff argues that the district court's decision in *Osen I* precludes Defendant's present withholdings under the doctrine of collateral estoppel, which "precludes a party from relitigating in a subsequent proceeding an issue of law or fact that has already been decided in a

prior proceeding." *Boguslavsky v. Kaplan*, 159 F.3d 715, 719-20 (2d Cir. 1998).  In particular, Plaintiff notes that Defendant did not appeal the district court's holding in *Osen I* that it had waived Exemption 1 with respect to information about the size of EFPs, and thus "that holding, and the analysis supporting it, remains in place between the parties." Pl. Br. at 10.  *Osen I*'s holding as to EFP size, however, was simply that Defendant's withholdings as to EFP size matched its prior disclosures and had therefore been waived under the official disclosure doctrine.[7] *See Osen I*, 375 F. Supp. 3d at 420 ("In the absence of further explanation for why these redactions are substantively different than the material already disclosed, the Court determines that CENTCOM has officially disclosed the material on EFP size.").  However, collateral estoppel applies only if, among other elements, "the identical issue was raised in a previous proceeding." *Boguslavsky*, 159 F.3d at 720. And *Osen I*'s holding as to EFP size is not identical to any issue raised in this litigation: whether the EFP size information Defendant redacted matched prior disclosures is simply a different question from whether the Vehicle Information matches any information in prior disclosures. The holding in *Osen I* that different information did match does not prevent Defendant from litigating whether the Vehicle Information matches in this case.

Next, Plaintiff's citation to *New Hampshire v. Maine*, 532 U.S. 742 (2001), a case that extensively discusses judicial estoppel, suggests that Plaintiff intends to rely on that doctrine (though without mentioning it by name). *See* Pl. Br. at 19. "A party invoking judicial estoppel

---

[7] Conceivably, Plaintiff's reference to "the analysis supporting" the district court's holding on EFP size in *Osen I*, Pl. Br. at 10, is intended to suggest that the district court reached that holding by accepting Plaintiff's argument that repeated disclosure operates as a waiver even in the absence of strict matching, such that under collateral estoppel Defendant is bound by that theory of waiver. However, while as Plaintiff notes Defendant may not have appealed the district court's application of that theory to EFP size, Defendant most certainly did appeal Plaintiff's underlying theory of waiver, which is why the Second Circuit devoted a substantial portion of its opinion in *Osen II* to explaining why that theory of waiver is incorrect. *See Osen II*, 969 at 109-114.

must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015). Plaintiff claims that it argued in *Osen II* that redacting only the strike points of images presented no national security benefit because such limited redactions would reveal the locations of strikes—the very argument Defendant advances before this Court to justify redacting such images in their entirety. Pl. Br. at 18-19; Unclassified Doyle Declaration ¶ 15. However, Plaintiff contends, Defendant opposed that argument in *Osen II*, "leading to judgment in its favor," and "cannot secure judgment in its favor by opposing Plaintiff's argument—arguing that revealing the location of strike points is not a factor in applying small redaction boxes to an image—then turn around and *rely on Plaintiff's* argument to redact *more* information." Pl. Br. at 19. As Plaintiff concedes, however, in *Osen II*, Defendant "argued its limited image redactions were necessary to protect national security under b(1) for *other* reasons." *Id.* at 18-19. And there is nothing inconsistent about arguing (1) that full redactions of images of successful EFP attacks are necessary to withhold information about how EFPs may be used to breach the defenses of American vehicles and (2) that partial redactions of those images also protect American national interests for "other reasons." Thus, Plaintiff has not shown that Defendant, "the party against whom the estoppel is asserted[,] took an inconsistent position in a prior proceeding." *Robinson*, 781 F.3d at 45. Defendant therefore is not estopped from maintaining the positions it has asserted in this litigation.

## B.     The Applicability of Exemption 1

Having determined that Defendant's withholding of the Vehicle Information is not directly precluded by its prior disclosure of similar information, the Court turns to the primary question of

whether Defendant has permissibly withheld that Information pursuant to Exemption 1. In general, "[a]n agency may invoke a FOIA exemption if its justification appears logical or plausible." *Osen II*, 969 F.3d at 114 (internal quotation marks omitted). The agency bears the burden of demonstrating that its withholdings fall within the claimed exemption, and it "may meet its burden by submitting a detailed affidavit showing that the information logically falls within the claimed exemptions." *Id.* As mentioned, Defendant here justifies its withholdings on the ground that the Vehicle Information is properly classified and therefore falls within Exemption 1. In support of that justification, Defendant relies upon the publicly filed Unclassified Doyle Declaration, which sets forth its reasons for withholding the Vehicle Information, and the Classified Doyle Declaration, which the Court has reviewed *in camera* and which provides additional details substantiating and augmenting certain assertions made in the Unclassified Doyle Declaration. When Exemption 1 is at issue, courts "must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record." *Id.* And in evaluating those affidavits, a court should grant summary judgment if they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [or] evidence of agency bad faith." *Id.*

As an initial matter, the Court finds that the publicly filed Unclassified Doyle Declaration describes Defendant's justification for withholding the Vehicle Information "with reasonably specific detail." That declaration first explains that that American national security would be threatened by the release of "specific details of how EFPs were able to effectively penetrate the armor on American military vehicles, as well as the types of vehicles and locations that were most vulnerable to penetration." Unclassified Doyle Declaration ¶ 9. Major General Doyle then

17

explains how adversaries could capitalize on this information to harm the national security of the United States and its allies[8]:

> Different combinations of factors make certain EFPs more effective at penetrating armor than others. When adjusted and combined in different ways, these factors have the potential to significantly influence the effectiveness of the EFP in penetrating armor. The government has now released some information about EFPs in the records at issue. If the withheld vehicle information were released, then adversaries could use the already-disclosed information—especially in combination with photographs depicting vehicles which are in continued use by U.S., Coalition, and Partner Nation forces—to assess the effectiveness of U.S. armor against specific types of EFP threats. That would further enable these actors, unable to match U.S. military strength in the field, to more effectively target U.S., Coalition, and Partner Nation forces and equipment with EFPs.

*Id.*

The Unclassified Doyle Declaration then describes how such details would be revealed were the Vehicle Information to be produced to Plaintiff. Photographs of vehicles damaged in specific attacks "would provide adversaries with specific and detailed information about the vulnerabilities of American war-fighting equipment, and would illustrate the effectiveness of particular types of EFPs," particularly when combined with other information about how EFPs were used in specific attacks. *Id.* ¶ 10. The public disclosure of such photographic information, Major General Doyle explains, "could be expected to cause serious damage to the national security by revealing in considerable and precise detail the vulnerabilities and capabilities of critical military equipment and infrastructure." *Id.*

Similarly, textual information describing the damage suffered by American vehicles in EFP attacks would reveal ways in which EFPs successfully breached American defenses. *Id.* ¶ 11. As

---

[8] As Major General Doyle explains, "the Department of Defense has provided the very vehicles USCENTCOM is protecting under Foreign Military Sales and Excess Defense Articles programs to Coalition and Partner Nation forces supporting current operations. These vehicles are currently in use, and the Department of Defense has an obligation to protect those forces." Unclassified Doyle Declaration ¶ 19.

Major General Doyle explains, "disclosing a textual description of where armor was (or was not) penetrated on a vehicle raises the same concerns as revealing even a redacted photograph of the same attack." *Id.* And disclosing the types of vehicles successfully damaged in EFP attacks would release "a trove of information that shows which vehicle types were (over time) most frequently damaged in attacks," thereby giving "hostile actors . . . insight into which types of vehicles are most vulnerable to which types of threats." *Id.*

Furthermore, the Unclassified Doyle Declaration explains that Defendant changed its standards for redaction for such materials in 2020 because it assessed that merely redacting strike point images, while still disclosing the Vehicle Information, would reveal "information about the location(s) of the battle damage on the targeted/damaged vehicle, as well as the types of vehicles and locations most vulnerable to EFPs." *Id.* ¶ 15; *accord id.* ¶ 13. Major General Doyle explains that the previously applied redactions to photographs and graphics "were not sufficient to avoid revealing information about the vulnerabilities and capabilities of military equipment and infrastructure," and that "the continued publication of redacted imagines and vehicle information, over time and in large volumes, would provide adversaries with knowledge that could be used to achieve greater accuracy and standoff when using EFPs." *Id.*; *accord id.* ("USCENTCOM determined that the dissemination of such information presented a direct threat to U.S. forces and our national security interests."). While the Court finds that the publicly filed Doyle Declaration on its own provides "reasonably specific detail" as to Defendant's justification for its redactions, as discussed below, the Classified Doyle Declaration contains additional details substantiating Defendant's assessment that American adversaries would likely use the Vehicle Information to more effectively conduct EFP attacks against American interests.

Next, the Unclassified Doyle Declaration demonstrates that the withheld Vehicle Information "logically falls within" Exemption 1. As mentioned, pursuant to Exemption 1, agencies need not disclose records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Executive Order 13,526 provides that information shall not be considered for classification unless both "its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security" and it pertains to at least one category from a list that includes "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security." Classified National Security Information, Exec. Order No. 13,526 §§ 1.2, 1.4, 75 Fed. Reg. 707, 709 (Dec. 29, 2009); *accord* Unclassified Doyle Declaration ¶ 8. Major General Doyle explains in his unclassified declaration that he conducted a "personal review of the documents at issue," and based on that review, as well as his "personal experience as a combat arms officer and commander in combat[] and information furnished to [him] in the course of [his] official duties," he "determined that all of the [V]ehicle [I]nformation . . . meets the classification criteria of Executive Order 13526," and thus the Vehicle Information is "currently and properly classified at the SECRET level." Unclassified Doyle Declaration ¶ 8. Major General Doyle further notes that, to the extent any of the Vehicle Information was not classified at the time Plaintiff submitted its FOIA requests, "in accordance with Executive Order 13526 Section 1.7(d), that information has since been determined to be classified on a document-by-document basis at [Major General Doyle's] direction as set forth in the current [United States Central Command Security Classification Guide, Central Command Regulation ("USCENTCOM SGC, CCR")] 380-14." *Id.*; *see* Exec. Order No. 13,526 § 1.7(d), 75

Fed. Reg. at 711 ("Information that has not previously been disclosed to the public under proper authority may be classified or reclassified after an agency has received a request for it under the Freedom of Information Act . . . only if such classification meets the requirements of this order and is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of this order.").

The justification articulated in the Unclassified Doyle Declaration demonstrates that the Vehicle Information logically satisfies the criteria under Executive Order 13,526.  Because American adversaries continue to use EFPs to threaten national security by attacking American vehicles, the Vehicle Information, which identifies how past EFP attacks were able to breach American defenses as well as the types of vehicles and locations on those vehicles most vulnerable to penetration, would educate those adversaries as to how they could similarly breach American and allied defenses in future attacks.  *See* Unclassified Doyle Declaration ¶¶ 9, 10.  This could reasonably be expected to cause identifiable and describable damage to national security. Furthermore, by identifying how past EFP attacks succeeded in damaging American vehicles, the Vehicle Information pertains to the "vulnerabilities" of those vehicles.  *Id.* ¶ 9.  Thus, the publicly filed Unclassified Doyle Declaration demonstrates that the Vehicle Information logically falls within Exemption 1.

Further, the Vehicle Information plainly falls within the categories of information classified at the SECRET level pursuant to USCENTCOM SGC, CCR 380-14.  *See id.* ¶¶ 14-15. As summarized by Major General Doyle, who signed and approved the currently applicable version of USCENTCOM SGC, CCR 380-14, *id.* ¶ 5, that regulation identifies as information classified as SECRET, among others: "cause of damage to a U.S. tactical vehicle and description

of IED effects (i.e., ballistic holes, dents, spalling, penetrations, fire, etc.); location(s) of U.S. tactical vehicle damage, to include reference to interior or exterior areas; blast or projectile's angle of attack/impact, velocity, etc.; and U.S. tactical vehicle speed at time of attack/impact." *Id.* ¶ 14. Consistent with Executive Order 13,526, such information—which "can be conveyed through text, drawings, sketches, photographs, charts, or storyboards"—"could be used to identify exploitable vulnerabilities of U.S. combat systems, or to identify the effectiveness of weapons or munitions used against U.S. combat systems." *Id.* Under USCENTCOM SGC, CCR 380-14, documents falling under "these categories cannot be classified unless they are 'sanitized' of 'battle damage' information," and Defendant has determined "that it is not possible to fully sanitize photographs of all battle damage information, because the redacted photographs still revealed information about the location(s) of the battle damage on the targeted/damaged vehicle, as well as the types of vehicles and locations most vulnerable to EFPs." *Id.* ¶ 16.[9] Defendant's application of USCENTCOM SGC, CCR 380-14 to the Vehicle Information, which itself is entirely in line with Executive Order 13,526, thus further demonstrates that the Vehicle Information "logically falls within" Exemption 1.

The Classified Doyle Declaration provides additional "reasonably specific detail" as to Defendant's justification for its redactions, as well as information that further corroborates and bolsters the explanation set forth in the Unclassified Doyle Declaration for why the Vehicle Information "logically falls within" Exemption 1. As previewed in the Unclassified Doyle Declaration, "intelligence and events occurring both in and outside of Iraq [have] revealed the

---

[9] As Major General Doyle explains, USCENTCOM SGC, CCR 380-14 also protects at the SECRET level the degree "of protection provided by factory installed or added armor to a U.S. tactical vehicle against IEDs, underbody mines, or explosively formed projectiles," because such information "could be used to identify and defeat armor survivability and protection performance of U.S. military vehicle systems." Unclassified Doyle Declaration ¶ 16.

extended reach of criminal organizations and the persistent and increasingly sophisticated nature of the EFP threat." *Id.* ¶ 17.









Lastly, Plaintiffs' attempts to controvert this justification by citing purportedly "contrary evidence in the record" are unpersuasive. Plaintiff's primary argument in this regard relies centrally on the fact that Defendant's prior productions in *Osen I* have already disclosed considerable information similar to the Vehicle Information that Defendant now seeks to withhold. Any argument for withholding the Vehicle Information today, Plaintiff claims, would have applied even more strongly to the similar information disclosed then, since the information has become less relevant with the passage of time. *E.g.*, Pl. Br. at 6 ("Thus, the *only* difference between the *Osen I* and *III* suits is that in the intervening years since Plaintiff filed *Osen I*, the underlying facts at issue have grown more distant in time and less sensitive as a matter of national security, and the U.S. forces have almost entirely departed Iraq and now Afghanistan."). Thus, Plaintiff reasons, if Defendant's prior disclosures did not threaten national security, neither would the disclosure of the information Defendant is presently withholding: Defendant "has not explained how adding a *smaller* number of additional disclosures from the *same* time period presents a national security

threat that the larger sum of disclosures it has already made did not." Pl. Reply at 7; *see also* Pl. Br. at 2-3 ("Each of these types of information were disclosed in *Osen I* most of the time, if not universally. CENTCOM made clear . . . that these issues did not pos[e] a national security risk that justified withholding. CENTCOM cannot now depart from its prior disclosure standards without a reasonable explanation."); *id.* at 11 (suggesting Defendant had "redact[ed] a type of information half the time—without explanation as to what distinguishes one half from the other").

Plaintiff misunderstands Defendant's position. Certainly, the logic and plausibility of Defendant's justification for its present withholdings would be undermined were Defendant to concede that materially indistinguishable information about other attacks can today safely be disclosed, as Plaintiff suggests it does. But Defendant does not concede the propriety of the disclosures in *Osen I* while maintaining that the very same type of information cannot properly be disclosed now. Instead, Defendant has simply changed its position: while it previously believed that the disclosure of the Vehicle Information did not threaten national security, it now believes that national security is threatened both by the disclosures in *Osen I*—which, having already occurred, cannot be undone—and by those Plaintiff now seeks. *See* Unclassified Doyle Declaration ¶ 15. In changing circumstances, Defendant has "changed its classification standard based on a revised risk assessment and more potent threats." Deft. Br. at 15; *accord id.* at 13-14.

Major General Doyle further explains that, even though the Vehicle Information is more than ten years old, Defendant "has assessed that its release would continue to create a risk of serious damage to national security." Unclassified Doyle Declaration ¶ 19. He explains that while military hardware has advanced since the attacks at issue in Plaintiff's requests, "release of the vehicle information in these records—especially in the volume and detail sought here—would pose a risk to current U.S. military operations." *Id.*



Further, the Department of Defense has provided the very same vehicles that are the subject of the Vehicle Information "to Coalition and Partner Nation forces supporting current obligations," "[t]hese vehicles are currently in use, and the Department of Defense has an obligation to protect those forces."  Unclassified Doyle Declaration ¶ 19.  Releasing the Vehicle Information, Major General Doyle explains, would expose vulnerabilities of these vehicles and "directly endanger Coalition and Partner Nation forces."  *Id.*



[REDACTED]

Thus, even assuming *arguendo* that the passage of time has in some respects reduced the threat posed by the release of the Vehicle Information, Defendant has concluded that any such reduction is outweighed by the effects of the changing threat environment and its revised assessment of the risk faced by U.S. and allied forces, such that withholding is now necessary. *E.g.*, Unclassified Doyle Declaration ¶ 17 (noting "the persistent and increasingly sophisticated nature of the EFP threat"). That judgment is entitled to "substantial weight," *Osen II*, 969 F.3d at 115, and no evidence in the record controverts it.

To be sure, a present willingness to disclose information materially indistinguishable from the Vehicle Information would suggest that Defendant does not actually believe its disclosure would threaten national security, thereby undermining the plausibility of its justification. But the fact that Defendant once held a different view in the past, when circumstances were different, hardly undermines its position today: Plaintiff presents no authority to support the suggestion that an agency is forbidden from altering what it redacts from FOIA disclosures as changes in the world and in its appreciation of threats to national security alter whether certain information falls within FOIA's exemptions.[10] Defendant would not be able to lawfully redact the Vehicle Information now if it presented "no reason to distinguish its prior conduct from its current conduct." Pl. Br. at 13. But Defendant has presented such a reason—namely, that based on new evidence, it now

---

[10] Plaintiff argues at length that some of the Vehicle Information, though classified now, was not classified before Plaintiff requested it. Pl. Reply at 11-13. But for reasons similar to those discussed above, the Court sees nothing improper about Defendant's decision to change its classification determinations, and therefore reclassifying certain records, after learning new information about threats to national security that impacts its classification determinations. And Plaintiff has presented no authority holding that withholding reclassified information is improper.

assesses that American adversaries are likely to use the Vehicle Information to improve the effectiveness of their attacks on American military equipment. *See* Unclassified Doyle Declaration ¶¶ 17-19. It is logical and plausible that Defendant changed its classification standards as a result; indeed, it would have been illogical for Defendant not to change its standards in response to its revised threat assessment.

Alternatively, Plaintiff attempts to undermine Defendant's justification for withholding the Vehicle Information by arguing, in essence, that the disclosure of that information would not threaten national security because any information that might be revealed to American adversaries via the disclosure of the Vehicle Information could also be obtained through alternative sources of information already available to the public. For example, Plaintiff maintains that some of the armor successfully penetrated by EFPs is "just steel" that "has been used since World War II and is available commercially," such that "studies of the effects of explosives on it are available online." Pl. Br. at 23. Similarly, Plaintiff notes that Humvees—a type of vehicle that, it claims, has been damaged in EFP attacks—"are readily available as well around the world," and indeed that "ISIS itself had captured thousands" of them and "could experiment on them all it liked." *Id.* at 23 n.8; *see also* Pl. Reply at 10, 13 n.5. It further notes that the Department of Defense has itself published detailed information about its vehicles and their vulnerabilities. Pl. Reply at 4-5; *see also* Pl. Br. at 13.

The existence of alternative sources of information does not undermine the logic or plausibility of Defendant's rationale for withholding the Vehicle Information. The mere fact that information can be obtained from multiple sources hardly entails that no relevant differences exist between the value or usefulness of those sources. Perhaps American adversaries, consulting academic studies on the properties of vehicle armor and public manuals describing American

Case 1:19-cv-06867-JPC   Document 75   Filed 09/01/23   Page 31 of 34

vehicles, could figure out how to effectively attack those vehicles using EFPs. But the fact that American adversaries *could* do so does not mean they *will* do so, or that they *have* done so; the detailed work of weaving such sources together into a tactical manual for conducting attacks would hardly be easy, and even if done there is no guarantee it would be done accurately and effectively. By contrast, Plaintiff seeks, essentially, a detailed, organized archive of successful EFP attacks on American vehicles. Unlike the academic studies that American adversaries might rely upon instead, the Vehicle Information would directly inform them of when EFP techniques have succeeded and how. Thus, even assuming *arguendo* that the Vehicle Information would not be the only source of information that could be used to hone methods of employing EFPs, the Vehicle Information is plausibly an unusually valuable source of information for that purpose, because it is much more directly related to the challenges American adversaries face in determining how EFPs can best penetrate the defenses of American vehicles. And even if American adversaries could rely on alternative sources of information to hone their techniques for employing EFPs, it is logical and plausible that national security would be threatened by the release of an additional source of information that would be considerably more useful than existing sources for that purpose.

Plaintiff further suggests that the disclosures already made in response to the requests litigated in *Osen I* themselves constitute an alternative source of information that American adversaries might employ to secure whatever advantage they could otherwise glean from the Vehicle Information. *E.g.*, Pl. Reply at 13 ("[T]he fact that Humvees were frequently and successfully targeted by EFPs, which [Defendant] suggests is valuable information, has already been irretrievably disclosed. [Defendant] made clear in *Osen I* that the Humvee was frequently targeted successfully by EFPs . . . ."). In general, however, even when some information helpful

31

to American adversaries has already been released, it is logical and plausible that the release of additional helpful information would additionally help them. *See, e.g., Osen II*, 969 F.3d at 116 ("The more images of different attacks that become available to the public, the more adversaries might learn about the Army's weaponry, a potential development that CENTCOM logically posits puts national security at risk."). Certainly, a point might be reached at which the information already disclosed becomes so voluminous that no further benefit could be expected from additional disclosure. *See id.* ("[T]he more images of individual attacks that components of DoD voluntarily release on a piecemeal basis, the less compelling this position will become . . . ."). But Major General Doyle, whose declarations are entitled to "substantial weight" before this Court, *see id.*, denies that that point has been reached, insisting instead that the continued disclosure would further threaten national security. *See, e.g.*, Unclassified Doyle Declaration ¶ 9; Classified Doyle Declaration ¶¶ 8-20. This claim is logical and plausible, and no other evidence in the record undermines it.

Lastly, Plaintiff argues that permitting Defendant to redact the Vehicle Information would violate "fundamental fairness" in that "what determines whether a Victim, including Gold Star family members of a service member killed in an Attack, gets access to as much information as possible in describing the Attack in which the Victim was injured or family member killed" would be "whether that Victim's request fell into *Osen I* or *Osen III*." Pl. Br. at 16. But this argument proves too much. Whenever classification standards change—indeed, whenever *any* law changes—those governed by the earlier rule will be treated differently than those governed by the changed rule. To be sure, such differences in treatment may be regrettable, but if a change alone violates fundamental fairness, then the law could never change. FOIA does not prohibit changes in classification standards, and Plaintiff has presented no authority holding that it does. Therefore,

32

the fact that information withheld now would have been released had it been requested earlier does not show that Defendant's withholdings are inconsistent with FOIA; rather, it reflects the fact that sometimes classification determinations change, thereby impacting the results of disputes governed by those changed determinations.

## IV. Conclusion

As the Second Circuit has remarked, "[c]ourts are not well-suited to evaluate the constantly evolving military conditions and national security challenges faced by U.S. forces and personnel. Judges do not abdicate their judicial role by acknowledging their limitations and deferring to an agency's logical and plausible justification in the context of national security; they fulfill it." *Am. Civ. Liberties Union v. U.S. Dep't of Just.*, 901 F.3d 125, 136 (2d Cir. 2018). This case requires the Court to fulfill its judicial role in exactly that manner. While Plaintiff's clients have a legitimate interest in obtaining the Vehicle Information that Plaintiff seeks, Defendant likewise has a legitimate and vital interest in protecting American interests from national security threats. Courts lack the qualifications and expertise to evaluate those threats and to ascertain what information, if released, would unacceptably enhance them; thus, the law entrusts the officials responsible for protecting national security, not this Court, to make such evaluations and to decide on that basis whether to release or withhold information. There can be no guarantee, of course, that such decisions are correct, but so long as Defendant's reasoning is logical and plausible this Court cannot supplant that reasoning with its own. And because Defendant's reasoning is logical and plausible, its motion for summary judgment is granted, and Plaintiff's motion for summary judgment is denied. Defendant need not produce the Vehicle Information in response to Plaintiff's requests (although, as the parties agree, *see, e.g.*, Unclassified Doyle Declaration ¶ 13 n.2, images or information shall not be redacted where the very same images or information has already been

33

released to Plaintiff in response to a prior request).  Within seven days of the public filing of this Opinion and Order, the parties shall submit a joint letter informing the Court of whether this case may be closed, or whether the Court should retain jurisdiction because disputes over the redaction of specific documents remain to be resolved.  *See* Dkt. 61 at 2.  The Clerk of Court is respectfully directed to close the motions pending at Docket Numbers 62 and 66.

      SO ORDERED.

Dated: August 29, 2023
      New York, New York

                          JOHN P. CRONAN
                        United States District Judge